278 P.3d 203 (2012)
STATE of Washington, Respondent,
v.
Cleo Palmer REED a.k.a. Cleo Reed Palmer, Appellant.
No. 66745-9-I.
Court of Appeals of Washington, Division 1.
June 4, 2012.
*208 Thomas Kummerow, Oliver Davis, Washington Appellate Project, Seattle, WA, for Appellant.
Andrea Vitalich, King County Prosecutor's Office, Seattle, WA, for Respondent.
DWYER, J.
¶ 1 Statements to law enforcement officers do not implicate the Sixth Amendment's confrontation clause where those statements are made under circumstances that, objectively viewed, indicate that the primary purpose of the encounter was to enable the police to meet an ongoing emergency. Here, Cleo Reed appeals from his conviction of assault in the second degree arising from an incident in which he strangled his girlfriend, Nat Emily Ta. Reed contends that the admission of out-of-court statements uttered by Ta violated his federal right to confront the witnesses against him. However, because an objective evaluation of the circumstances demonstrates that Ta made these statements in the course of an ongoing emergency, Ta's statements are nontestimonial and, accordingly, are not subject to the requirements of the confrontation clause. Because Reed's other contentions are also without merit, we affirm his conviction.

I
¶ 2 At approximately 2:00 p.m. on June 23, 2010, Nat Emily Ta placed a 911 call. Ta told the operator that her boyfriend, Cleo Reed, was "choking" her, "scratching" her, had "punched [her] lip," and was continuing to threaten her. Reed, who remained at the scene, could be heard shouting in the background during the call. Ta said that Reed had recently been in jail. The call disconnected before the operator could determine Ta's location.
¶ 3 Ta called 911 again at approximately 11:00 p.m. Ta told the operator that "this mother fucker he just beat me up right now." She explained that Reed had again been "choking [her]," and that she was "bleeding on [her] nose." She told the operator that the attack had occurred while the couple was driving with Reed's cousin. Ta stated that she was "pregnant right now" and that Reed had left her by the side of the road in an unfamiliar area of Renton. Ta struggled to convey her location to the operator. She told the operator that she needed a "cop" but did not require medical assistance.
¶ 4 The operator continued to question Ta while Ta waited in the parking lot of a McDonald's restaurant for police to arrive. Ta gave a detailed description of Reed, described Reed's use of cocaine and alcohol, and alluded to prior violent acts by Reed. She told the operator that she needed to "put his ass back in jail."
¶ 5 Renton Police Officer Robert Bagsby was the first officer to arrive at the scene. Upon Officer Bagsby's arrival, Ta ran to his patrol car. Without prompting, Ta exclaimed that "my boyfriend beat me up, choked me, [and] wouldn't let me out of my car." Ta was "hysterical" and "crying uncontrollably." She was out of breath and spoke in "short, brief sentences." After once again declining medical treatment, Ta described the incident in greater detail.
¶ 6 Seattle Police Officer John Marion thereafter assumed responsibility for the investigation. Officer Marion took photographs of Ta's injuries, which included a bleeding lip and fresh red marks and scratches on her neck, face, and hands. Officer Marion interviewed Ta, took a written statement, and then drove her home.
¶ 7 Reed was initially charged with one count of assault in the second degree. However, following Reed's arrest, he placed at least two telephone calls to Ta from jail. Reed instructed Ta to write a letter stating that she had lied to the police, and that Reed had never "hit" her, "choked" her, or "smacked" her. Reed told Ta to have the letter notarized and to make several copies. He instructed Ta to come to court and to *209 make it clear that he was not forcing her to recant. Based upon these phone calls, Reed was also charged with one count of tampering with a witness. In addition, the State alleged the aggravating circumstance that Ta was pregnant at the time of the assault.
¶ 8 Reed was arraigned on July 15, 2010. As Reed had instructed her to do, Ta appeared at the hearing and gave a copy of the notarized letter to the prosecutor. Ta requested that Reed be released and that no no-contact order be issued. Despite the prosecutor's efforts to persuade Ta to appear as a witness at Reed's trial, Ta refused to cooperate. The prosecutor decided against requesting a material witness warrant for Ta's arrest.
¶ 9 As expected, Ta did not appear to testify at trial. However, the trial court ruled admissible portions of Ta's two 911 calls and her initial, spontaneous, statements to Officer Bagsby after determining that these statements were nontestimonial for purposes of the confrontation clause.[1] The trial court concluded that the latter portions of Ta's second 911 call and all statements made to officers following her initial statements to Officer Bagsby were testimonial. Accordingly, these statements were not admitted at trial.
¶ 10 At the conclusion of the trial, the jury convicted Reed of assault in the second degree and witness tampering as charged, but did not find the aggravating circumstance to have been proved. The trial court imposed a standard-range sentence.
¶ 11 Reed appeals.

II
¶ 12 Reed first contends that the trial court erred by admitting into evidence statements made by Ta during the two 911 calls and to Officer Bagsby upon his arrival at the scene. We disagree.
¶ 13 The confrontation clause of the Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. The confrontation clause bars the admission of "testimonial" hearsay unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).[2]
¶ 14 In Crawford, the United States Supreme Court left "for another day any effort to spell out a comprehensive definition of `testimonial.'" 541 U.S. at 68, 124 S.Ct. 1354. However, in the years following the filing of that decision, the Court has, on several occasions, more fully delineated the parameters of testimonial hearsay in the context of police interrogations. See Michigan v. Bryant, ___ U.S. ___, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011); Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Where the police are involved in procuring an unconfronted statement, whether the statement is testimonial depends upon the "primary purpose" for the interrogation during which the statement was made. Davis, 547 U.S. at 822, 126 S.Ct. 2266. Where the interrogation is "directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator," the product of such an interrogation is necessarily testimonial. Davis, 547 U.S. at 826, 126 S.Ct. 2266. In contrast, statements are nontestimonial when made "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Davis, 547 U.S. at 822, 126 S.Ct. 2266. Accordingly, "the existence of an `ongoing emergency' at the time of an encounter between an individual and the police is among the most important circumstances informing the `primary *210 purpose' of an interrogation."[3]Bryant, 131 S.Ct. at 1157.
¶ 15 "[W]hether an emergency exists and is ongoing is a highly context-dependent inquiry." Bryant, 131 S.Ct. at 1158. In order to ascertain the primary purpose of a police interrogation, a court must "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." Bryant, 131 S.Ct. at 1156. "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Bryant, 131 S.Ct. at 1156.
¶ 16 Our inquiry is guided by four relevant factors. See State v. Koslowski, 166 Wash.2d 409, 418-19, 209 P.3d 479 (2009); State v. Ohlson, 162 Wash.2d 1, 11-12, 168 P.3d 1273 (2007). First, we examine the timing of the statements relative to when the described events occurred. Davis, 547 U.S. at 827, 126 S.Ct. 2266. Where a speaker has described events as they were actually occurring, such statements are indicative of an ongoing emergency. Davis, 547 U.S. at 827, 126 S.Ct. 2266. Conversely, a description of past events is less likely to demonstrate a present need for assistance. Davis, 547 U.S. at 829-30, 126 S.Ct. 2266.
¶ 17 Second, we assess the nature of what was asked and answered during the interrogation to determine whether the elicited statements were necessary to resolve a present emergency or merely to determine what happened in the past. Davis, 547 U.S. at 827, 126 S.Ct. 2266. For instance, a 911 operator's effort to establish an assailant's identity"so that the dispatched officers might know whether they would be encountering a violent felon"would tend to indicate that the elicited statements were nontestimonial. Davis, 547 U.S. at 827, 126 S.Ct. 2266.
¶ 18 Third, we consider the threat of harm posed by the situation as judged by a "reasonable listener." Davis, 547 U.S. at 827, 126 S.Ct. 2266. A plain call for help "against a bona fide physical threat" strongly suggests that the speaker is facing an ongoing emergency. Davis, 547 U.S. at 827, 126 S.Ct. 2266. On the other hand, where it is clear that the threat posed by the perpetratorto either the victim, the police, or the publichas been neutralized, such circumstances tend to indicate that no ongoing emergency exists. Bryant, 131 S.Ct. at 1158.
¶ 19 Finally, we evaluate the level of formality of the interrogation. Davis, 547 U.S. at 827, 126 S.Ct. 2266. The greater the formality of the encounter, the more likely it is that a statement elicited during that encounter is testimonial. Bryant, 131 S.Ct. at 1160. In contrast, disorganized questioning in an exposed, public area that is neither tranquil nor safe tends to indicate the presence of an ongoing emergency. Bryant, 131 S.Ct. at 1160; Davis, 547 U.S. at 827, 126 S.Ct. 2266.
¶ 20 As an initial matter, Reed asserts that the trial court erred by redacting certain portions of the 911 recordings prior to determining that Ta's remaining statements were nontestimonial. Reed is, of course, correct that the primary purpose of an interrogation must be derived from all of the circumstances of the encounter, Bryant, 131 S.Ct. at 1156, and that a court would err were it to strike offensive portions of a speaker's statements before making such a determination. However, the record does not support Reed's assertion that such a thing took place in this case. Although it is true that portions of the 911 recordings were ultimately kept from the jury, the trial court clearly considered the entirety of the recordings in determining the testimonial nature of Ta's statements. Indeed, the redacted portions were redacted not because the statements were testimonial but, rather, because *211 the court determined that their admission would be unduly prejudicial to Reed.[4]
¶ 21 Moreover, a trial court may determine "in the first instance when any transition from nontestimonial to testimonial occurs." Bryant, 131 S.Ct. at 1159-60. "[A] conversation which begins as an interrogation to determine the need for emergency assistance [can] ... `evolve into testimonial statements.'" Davis, 547 U.S. at 828, 126 S.Ct. 2266 (quoting Hammon v. State, 829 N.E.2d 444, 457 (2005)). "Just as, for Fifth Amendment purposes, `police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect,' ... trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial." Davis, 547 U.S. at 829, 126 S.Ct. 2266 (quoting New York v. Quarles, 467 U.S. 649, 658-59, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)). Accordingly, the trial court was permitted to determine that, although the latter portion of Ta's second 911 call was testimonial, the statements in the first portion of the call did not implicate Reed's right to confrontation.
¶ 22 Turning to the merits of Reed's confrontation clause challenge, it is clear that the trial court properly determined that Ta's statements in the first 911 call were nontestimonial. An objective evaluation of the "circumstances in which the encounter occurs and the statements and actions of the parties" demonstrates that the primary purpose of the investigation was to meet an ongoing emergency. Bryant, 131 S.Ct. at 1156. Although the record does not indicate that Ta was being choked or punched during her conversation with the operator, Ta made clear that Reed's actions occurred in the recent past. As our Supreme Court has observed, where statements are made "within minutes of the assault," such statements may properly be considered as "contemporaneous[] with the events described." Ohlson, 162 Wash.2d at 17, 168 P.3d 1273. Indeed, Ta stated during the call that Reed was "threatening me right now." Moreover, the operator's focus on ascertaining Ta's location indicates that the primary purpose of the interrogation was to provide emergency assistance. The record does not reflect that the operator was attempting merely to determine "what had happened in the past." Davis, 547 U.S. at 827, 126 S.Ct. 2266. In addition, there is little doubt that a reasonable listener would conclude that Reed posed a bona fide physical threat to Ta. Reed was present throughout the call and can be heard shouting angrily in the background. Finally, the lack of formality of the interrogation favors admissibilityTa made these statements from an unsafe location, outside of police protection, and in the presence of an angry, vocal assailant. The court did not err by determining that these statements were nontestimonial.
¶ 23 The trial court also properly admitted statements made during the first portion of Ta's second 911 call.[5] As in Ta's previous 911 call, Ta described very recent events to the operator. Ta told the operator that Reed had "just beat me up right now." She stated that these events took place within minutes of her placing the call, see Ohlson, 162 Wash.2d at 17, 168 P.3d 1273, repeatedly telling the operator that the assault had occurred "just right now." Moreover, the nature of the questions asked indicates that the purpose of the interrogation was to resolve an emergency. The operator's questions during this portion of the call were designed to ascertain Ta's location, her need for medical assistance, and to determine whether *212 Reed remained in the area where he could continue to pose a threat to Ta and responding officers. Furthermore, as in the first call, the interrogation lacked formalitya distressed and frightened Ta struggled to communicate even the basic circumstances of her situation from a public area with which she was obviously unfamiliar. All of these circumstances demonstrate that the primary purpose of the second 911 call was to enable a response to Ta's emergency.
¶ 24 Nevertheless, Reed contends that, because Reed had left the scene of the assault prior to Ta's 911 calla fact that was clearly communicated to the operatorno reasonable listener could have determined that Reed posed the type of continuing threat that is necessary to demonstrate the existence of an ongoing emergency. However, insofar as Reed asserts that the absence of an assailant from the scene of a domestic assault necessarily establishes the lack of an emergency, Reed is mistaken. See Bryant, 131 S.Ct. at 1158 ("The Michigan Supreme Court erroneously read Davis as deciding that `the statements made after the defendant stopped assaulting the victim and left the premises did not occur during an "ongoing emergency."'" (quoting People v. Bryant, 483 Mich. 132, 149 n. 15, 768 N.W.2d 65 (2009))). Although the Court in Bryant noted that, in the context of domestic violence, a court should assess the presence of an ongoing emergency "from the perspective of whether there was a continuing threat to [the victim]," 131 S.Ct. at 1158, this does not mean that the departure of a domestic assailant necessarily eliminates the potential threat.[6]
¶ 25 Here, Ta was alone and injured, and her assailant was still at large. The operator was aware that Reed, having driven away only moments before Ta placed the call, was highly mobile and could potentially return to the scene to resume the assault. See Ohlson, 162 Wash.2d at 18, 168 P.3d 1273 ("[T]here is no way to know, and every reason to believe, that Ohlson might return ... and perhaps escalate his behavior even more."). Although a reasonable listener is unlikely to have determined that Reed posed a public threat, Reed clearly continued to pose a "bona fide physical threat" to Ta. Davis, 547 U.S. at 827, 126 S.Ct. 2266. The trial court did not err by determining that Ta's statements during this portion of the second 911 call were nontestimonial and, thus, admissible.[7]
¶ 26 Finally, Reed contends that Ta's initial statements to Officer Bagsby upon this officer's arrival at the scene constitute testimonial statements. Reed first asserts that, because the trial court determined that Ta's statements during the latter portions of her second 911 call were testimonial, it cannot be that the emergency persisted beyond the point at which her answers "`evolve[d] into testimonial statements.'" Davis, 547 U.S. at 828, 126 S.Ct. 2266 (quoting Hammon, 829 N.E.2d at 457). We disagree.
¶ 27 The purpose of an interrogation must be objectively evaluated from the statements and actions of the parties to the encounter. Bryant, 131 S.Ct. at 1156. It is certainly possible that a responding officer's obvious focus on eliciting testimonial statementseven during an emergencywill render the declarant's responses testimonial. This does not mean that the emergency necessarily has ended. Where a subsequent questioner clearly refocuses the inquiry on resolving that emergency, a trial court should not ignore the purpose of the subsequent interrogation, objectively viewed. Reed's proposed per se rule of exclusion is without support in the case law.
*213 ¶ 28 Here, our review of the circumstances of Ta's encounter with Officer Bagsby indicates that Ta's initial, spontaneous statements were made, not to "prove past events potentially relevant to later criminal prosecution," Davis, 547 U.S. at 822, 126 S.Ct. 2266, but to secure police assistance in responding to an emergency. As in the 911 calls, both the timing of Ta's statements and the lack of formality of the encounter favor admission of Ta's statements. These statements, which occurred only six minutes after Ta placed the second 911 call, were made under circumstances that lacked the formality typical of a police interrogation designed to elicit information for later use in a prosecution. The interrogation (such as it was) took place in an exposed and unfamiliar public placea far cry from the calm and structured setting of the station house, where Ta would have been alerted to "the possible future prosecutorial use of [her] statements." Bryant, 131 S.Ct. at 1167.
¶ 29 Moreover, objectively viewed, Ta's behavior under these circumstances indicates that the purpose of her statements was to secure police protection.[8] Upon Officer Bagsby's arrival at the scene, Ta ran to his vehicle and, without prompting, exclaimed that she had been attacked.[9] Ta was "hysterical" and "crying uncontrollably." She was out of breath and bleeding from her mouth. Furthermore, although Officer Bagsby's arrival temporarily eliminated the threat that Reed might return to do further harm to Ta, this protection was contingent upon his continued presence at the scene. Accordingly, Ta's initial statements are most reasonably understood as a victim's efforts to inform the police of an emergency, thus ensuring that an officer remain at the scene to provide assistance. Of course, once this police protection was secured, reasonable participants in Ta's and Officer Bagsby's circumstances would understand that the threat to Ta was neutralized and the emergency had ended. Consequently, as the trial court correctly determined, Ta's subsequent statements to Officer Bagsby and to later arriving officers were testimonial and, thus, inadmissible. However, because an objective evaluation of the circumstances makes clear that Ta's initial, spontaneous statements were primarily intended to secure police assistance, the trial court did not err by determining that these statements did not implicate the confrontation clause.[10]
*214 ¶ 30 The trial court properly determined that Ta's statements during the first 911 call, her statements during the first portion of the second 911 call, and her initial, spontaneous statements to Officer Bagsby were nontestimonial. The admission of these statements at trial did not violate Reed's right to confrontation.

III
¶ 31 Reed next contends that the trial court abused its discretion by denying his request for a missing witness instruction. Reed asserts that, because the State did not call Ta as a witness, he was entitled to argue to the jury that it should infer that Ta's testimony would have been unfavorable to the State's case against him. We disagree.
¶ 32 A trial court's refusal to issue a requested instruction, when based on the evidence in the case, is reviewed for abuse of discretion. State v. Walker, 136 Wash.2d 767, 771-72, 966 P.2d 883 (1998). A trial court abuses its discretion only where its decision is "manifestly unreasonable or based upon untenable grounds or reasons." State v. Powell, 126 Wash.2d 244, 258, 893 P.2d 615 (1995).
¶ 33 A missing witness instruction informs the jury that it may infer from a witness's absence at trial that his or her testimony would have been unfavorable to the party who would logically have called that witness. State v. Flora, 160 Wash.App. 549, 556, 249 P.3d 188 (2011). Such an instruction is proper where the witness is peculiarly available to one of the parties, Flora, 160 Wash.App. at 556, 249 P.3d 188, and the circumstances at trial establish that, as a matter of reasonable probability, the party would not have knowingly failed to call the witness "unless the witness's testimony would be damaging." State v. Davis, 73 Wash.2d 271, 280, 438 P.2d 185 (1968), overruled on other grounds by State v. Abdulle, ___ Wash.2d ___, 275 P.3d 1113 (2012). However, no inference is permitted where the witness is unimportant or the testimony would be cumulative. State v. Blair, 117 Wash.2d 479, 489, 816 P.2d 718 (1991). Nor is a party entitled to a missing witness instruction where the absence of the witness can be satisfactorily explained. Blair, 117 Wash.2d at 489, 816 P.2d 718 (citing State v. Lopez, 29 Wash.App. 836, 841, 631 P.2d 420 (1981)).
¶ 34 Here, the trial court did not abuse its discretion by refusing to give a missing witness instruction. As a threshold matter, Ta cannot be deemed to have been peculiarly available to the State. A witness is not "peculiarly available" merely because the witness is subject to the subpoena power. Blair, 117 Wash.2d at 490, 816 P.2d 718. Rather, as our state Supreme Court has explained:
For a witness to be "available" to one party to an action, there must have been such a community of interest between the party and the witness, or the party must have so superior an opportunity for knowledge of a witness, as in ordinary experience would have made it reasonably probable that the witness would have been called to testify for such party except for the fact that his testimony would have been damaging.
Davis, 73 Wash.2d at 277, 438 P.2d 185.
¶ 35 Thus, whether a witness is peculiarly available to a party depends upon the nature of the relationship between the witness and that party. In Davis, the court determined that an uncalled witness, a member of the law enforcement agency that had investigated the defendant, "worked so closely and continually with the county prosecutor's office with respect to this and other criminal cases as to indicate a community of interest between the prosecutor and the uncalled witness." 73 Wash.2d at 278, 438 P.2d 185. Similarly, in Blair, the court determined that missing witnesses were peculiarly available to the defendant where the names of the witnesseswith whom the defendant had both personal and business relationshipswere "known to defendant alone." 117 Wash.2d at 490, 816 P.2d 718.
¶ 36 By contrast, Ta had no professional relationship with the prosecutor. She was not a law enforcement agent; nor was she unknown to Reed. Indeed, Reed's influence over Ta appears to have exceeded that *215 of the prosecutorReed maintained contact with Ta throughout his time in jail and, on more than one occasion, convinced Ta to engage in conduct that would benefit his cause. If Reed truly believed that Ta's testimony would be unfavorable to the State's case against him, he had every opportunity to call her as a witness.[11] A missing witness instruction is not properly given if the uncalled witness is "equally available" to the parties. Blair, 117 Wash.2d at 490, 816 P.2d 718. Because Ta was not peculiarly available to the State, the trial court did not abuse its discretion by denying Reed's requested instruction.
¶ 37 Moreover, Ta's absence from trial was satisfactorily explained. The party against whom the missing witness rule would operate is entitled to explain that witness's absence and thereby avoid operation of the inference. Blair, 117 Wash.2d at 489, 816 P.2d 718. Here, it is likely that Reed's own conduct was responsible for Ta's absence at trial. Reed instructed Ta that she must recant her prior allegations and absolve him of blame for her injuries. At Reed's instruction, Ta delivered a notarized letter to the trial court, indicating her desire that charges against Reed be dismissed. She requested that the court decline to impose a no-contact order. Thereafter, Ta refused to cooperate with the prosecution. Although the trial prosecutor made multiple efforts to persuade Ta to appear at Reed's trial, Ta nevertheless declined to testify.
¶ 38 Given these circumstances, it is reasonable to believe that Ta's absence at trial was a product of Reed's influence. Indeed, the jury ultimately convicted Reed of tampering with a witness, finding that Reed had attempted to "induce [Ta] ... to testify falsely" in an official proceeding. Having sought to influence a witness at every opportunity, a defendant cannot thereafter claim the benefit of any inference derived from that witness's absence at trial. Ta's absence at trial was adequately explained. The trial court did not err by declining to give a missing witness instruction.

IV
¶ 39 Reed next asserts that the trial court's instructions to the jury relieved the State of its burden of proving the essential elements of assault in the second degree. He contends that, because the trial court's instructions did not require the jury to find that Reed had the specific intent to obstruct Ta's blood flow or ability to breathe, his conviction of this crime was obtained in violation of his right to due process. We disagree.
¶ 40 The State bears the burden of proving all of the essential elements of the charged crime beyond a reasonable doubt. State v. Oster, 147 Wash.2d 141, 146, 52 P.3d 26 (2002). A misstatement of the law in a jury instruction that relieves the State of its burden to prove every element of an offense is a violation of due process and requires automatic reversal. State v. Thomas, 150 Wash.2d 821, 844, 83 P.3d 970 (2004). We review alleged errors of law in jury instructions de novo. State v. Barnes, 153 Wash.2d 378, 382, 103 P.3d 1219 (2005).
¶ 41 A person is guilty of the crime of assault in the second degree by strangulation where that person intentionally "[a]ssaults another by strangulation." RCW 9A.36.021(1)(g). Strangulation is defined by statute as "to compress a person's neck, thereby obstructing the person's blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood flow or ability to breathe." RCW 9A.04.110(26). Accordingly, in order to convict Reed of assault in the second degree by strangulation, the State was required to prove beyond a reasonable doubt that Reed intentionally assaulted *216 Ta and that Reed either actually "obstruct[ed] [Ta's] blood flow or ability to breathe" by compressing her neck or that Reed compressed Ta's neck with the specific intent to cause this result. RCW 9A.04.110(26). The trial court was required to so instruct the jury.
¶ 42 Here, the trial court's instructions to the jury accurately stated the law. The "to convict" instruction for assault in the second degree stated that the jury must find that "the defendant intentionally assaulted Nat E. Ta by strangulation" in order to return a guilty verdict. "Assault" was correctly defined as "an intentional touching or striking of another person, with unlawful force." "Intent" was correctly defined as "acting with the objective or purpose to accomplish a result that constitutes a crime." Finally, "strangulation" was defined as "to compress a person's neck in a manner that obstructs the person's blood flow or ability to breathe, or to compress a person's neck with the intent to obstruct the person's blood flow or ability to breathe." This language precisely tracks the language of the relevant statute. Accordingly, the trial court's instructions permitted the jury to convict Reed if it found beyond a reasonable doubt that Reed assaulted Ta and either (1) actually obstructed Ta's blood flow or breathing by compressing her neck or (2) compressed Ta's neck with the intent to cause this result. RCW 9A.04.110(26). The trial court's instructions did not misstate the law.[12]
¶ 43 Nevertheless, Reed asserts that the trial court was required to instruct the jury that, even if it determined that Reed had actually obstructed Ta's blood flow or breathing by intentionally compressing her neck, the jury must also find that Reed possessed the specific intent to cause this result. As an initial matter, Reed contends that a contrary interpretation of the statute transforms assault by strangulation into a strict liability offensea result he asserts was never contemplated by the legislature. However, by definition, an assault is a willful act that requires intent. See State v. Hopper, 118 Wash.2d 151, 158-59, 822 P.2d 775 (1992). In contrast, a strict liability offense is a crime that contains no mens rea element whatsoever. See, e.g., State v. Chhom, 128 Wash.2d 739, 741-43, 911 P.2d 1014 (1996) (rape of a child has no mens rea element; it is a strict liability offense). Because assault in the second degree by strangulation requires that the State prove that the harmful or offensive touching was intentional, this crime is not a strict liability offense. Reed's contention to the contrary is without merit.
¶ 44 Moreover, Reed's proposed interpretation is contrary to the plain language of the statute, which defines strangulation in two ways: (1) by the actual injury suffered by the victim, regardless of the specific intent of the perpetrator or (2) by the specific intent of the perpetrator to obstruct the victim's blood flow or breathing, regardless of the actual injury suffered. RCW 9A.04.110(26). Many crimes are defined by the injury suffered by the victim without regard to the perpetrator's specific intent to cause that injury. See, e.g., RCW 46.61.520 (vehicular homicide); RCW 46.61.522 (vehicular assault); RCW 9A.32.030(1)(c) (first degree felony murder); RCW 9A.32.050(1)(b) (second degree felony murder). Reed points to no authority indicating that the legislature was not entitled to so define the crime of assault by strangulation.
¶ 45 Nor does the rule of lenity necessitate that the statute be interpreted to contain the additional element of specific intent. The rule of lenitywhich requires us to interpret a statute in favor of the defendant absent legislative intent to the *217 contraryapplies only when a statute is "subject to more than one reasonable interpretation." State v. Jacobs, 154 Wash.2d 596, 600-01, 115 P.3d 281 (2005). Here, because the statute's language is clear, the rule of lenity does not apply.
¶ 46 Pursuant to the trial court's instructions, the State was required to prove all of the essential elements of assault in the second degree beyond a reasonable doubt. The trial court's instructions were proper.

V
¶ 47 Reed finally contends that a statement regarding the presumption of innocence, made by the prosecutor during closing argument, constituted prosecutorial misconduct requiring reversal. We disagree.
¶ 48 "A defendant claiming prosecutorial misconduct must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial." State v. Miles, 139 Wash.App. 879, 885, 162 P.3d 1169 (2007). The propriety of a prosecutor's conduct is "reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given." State v. Russell, 125 Wash.2d 24, 85-86, 882 P.2d 747 (1994). In closing argument, a prosecutor is afforded wide latitude to draw and express reasonable inferences from the evidence. State v. Hoffman, 116 Wash.2d 51, 94-95, 804 P.2d 577 (1991). Improper comments are prejudicial only where "`there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.'" State v. Magers, 164 Wash.2d 174, 191, 189 P.3d 126 (2008) (alteration in original) (quoting State v. Pirtle, 127 Wash.2d 628, 672, 904 P.2d 245 (1995)). Moreover, "`[c]ounsel may not remain silent, speculating upon a favorable verdict, and then, when it is adverse, use the claimed misconduct as a life preserver on a motion for new trial or on appeal.'" Russell, 125 Wash.2d at 93, 882 P.2d 747 (quoting Jones v. Hogan, 56 Wash.2d 23, 27, 351 P.2d 153 (1960)). Consequently, where a defendant does not object and request a curative instruction at trial, reversal is unwarranted unless the objectionable remark "`is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury.'" State v. McKenzie, 157 Wash.2d 44, 52, 134 P.3d 221 (2006) (quoting State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997)).
¶ 49 Here, Reed asserts that the prosecutor engaged in irremediable misconduct by stating in rebuttal argument that the presumption of innocence "does last all the way until you walk into that [jury] room and start deliberating." Reed is correct that the prosecutor's statement regarding the presumption of innocence was an incorrect statement of the lawrather than dissipating at the beginning of deliberations, "[t]he presumption of innocence continues `throughout the entire trial' and may be overcome, if at all, during the jury's deliberations." State v. Venegas, 155 Wash.App. 507, 524, 228 P.3d 813 (quoting 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 85 (3d ed. 2008)), review denied, 170 Wash.2d 1003, 245 P.3d 226 (2010). However, Reed did not object to this statement at trial. Accordingly, Reed must demonstrate that the remark was so flagrant and ill-intentioned that no curative instruction would have been capable of neutralizing the resulting prejudice. This he does not do.
¶ 50 As our Supreme Court has recently determined, even where a prosecutor has engaged in far more egregious misconduct, a correct and thorough instruction can be sufficient to cure the resulting prejudice. State v. Warren, 165 Wash.2d 17, 28, 195 P.3d 940 (2008). In Warren, the prosecutor blatantly and repeatedly misstated the State's burden of proof during closing argument. On three occasions, the prosecutor told the jury that "[r]easonable doubt does not mean give the defendant the benefit of the doubt." Warren, 165 Wash.2d at 24-25, 195 P.3d 940. The court determined that this argumentwhich "undermined the presumption of innocence"was clearly improper. Warren, 165 Wash.2d at 26, 195 P.3d 940. The court explained that "[h]ad the trial judge not intervened to give an appropriate and effective curative instruction, we *218 would not hesitate to conclude that such a remarkable misstatement of the law by a prosecutor constitutes reversible error."[13]Warren, 165 Wash.2d at 28, 195 P.3d 940. However, because the trial court "interrupted the prosecutor's argument to give a correct and thorough curative instruction," the court determined that any resulting prejudice had been cured. Warren, 165 Wash.2d at 28, 195 P.3d 940.
¶ 51 Here, a similar curative instruction would have neutralized any prejudice resulting from the prosecutor's misstatement regarding the presumption of innocence. This statement was not repeated to the jury; nor was it coupled with other obviously improper arguments. Cf. State v. Evans, 163 Wash. App. 635, 643-44, 260 P.3d 934 (2011). Accordingly, this misstatement is far less likely to have affected the jury's verdict than the prosecutor's comments at issue in Warren. We have no doubt that a simple instruction from the trial court indicating that the presumption of innocence may be overcome, if at all, only during the jury's deliberations would have been sufficient to overcome any prejudice resulting from the prosecutor's remark. Because the prosecutor's conduct was not so flagrant and ill-intentioned that any resulting prejudice could not have been neutralized by a curative instruction, reversal is unwarranted.
¶ 52 Affirmed.[14]
We concur: SCHINDLER, and COX, JJ.
NOTES
[1] Reed asserted his confrontation clause objection prior to trial. After hearing arguments by the prosecutor and defense counsel, the trial court engaged in a detailed analysis on the record to determine whether each set of statements was testimonial. Although the trial court determined that not all of Ta's out-of-court statements would be admitted, the record makes clear that the trial court understood that it was ruling admissible the remaining statements over Reed's objection.
[2] We review alleged violations of the confrontation clause de novo. State v. Koslowski, 166 Wash.2d 409, 417, 209 P.3d 479 (2009).
[3] There may, of course, be other purposes for a police interrogation that will not tend to generate testimonial hearsay. See Bryant, 131 S.Ct. at 1155 ("[T]here may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony.").
[4] The trial court redacted all references to Reed's race and recent imprisonment. However, the record does not indicate that the trial court failed to consider these utterances when determining whether Ta's statements were testimonial.
[5] On appeal, Reed focuses on Ta's subjective intent in reporting Reed's conduct to police, explaining that, by the time of this second call, Ta's "awareness that her statements [could] be used to prosecute Mr. Reed [had] ripened into an adamant desire that they be so used." However, an ascertainment of Ta's subjective intent is not the proper inquiry. "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had." Bryant, 131 S.Ct. at 1156. This is an objective inquiry.
[6] In explaining this focus, the Court explained that "[d]omestic violence cases ... often have a narrower zone of potential victims than cases involving threats to public safety." Bryant, 131 S.Ct. at 1158. The Court noted that the duration and scope of an emergency may depend upon the type of weapon involved. Bryant, 131 S.Ct. at 1158. An emergency is more limited in scope when the assailant is "armed only with his fists." Bryant, 131 S.Ct. at 1159.
[7] That Reed did not actually return to the scene is of no consequence. "If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the confrontation clause." Bryant, 131 S.Ct. at 1157 n. 8.
[8] Officer Bagsby said nothing to elicit these statements by Ta. Thus, only his behavior can be objectively evaluated in ascertaining the purpose of this initial encounter. His behavior consisted of responding to the report of a recent assault and stopping his patrol car in a parking lot where he believed that he would encounter the victim.
[9] The State asserts that, because Ta's statements were entirely spontaneous, it is questionable whether the confrontation clause is implicated at all. However, the Supreme Court has made abundantly clear that interrogation is not a prerequisite for testimonial hearsay. In Davis, the court explained:

Our holding refers to interrogations because, as explained below, the statements in the cases presently before us are the products of interrogationswhich in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial. The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation.
547 U.S. at 822 n. 1.
[10] Reed further contends that his right to confrontation was violated by the admission of Ta's statements because the State failed to demonstrate that Ta was "unavailable." However, Reed cannot assert a freestanding confrontation clause claim based upon the State's failure to produce a witness at trial. Instead, Ta's statements are either testimonial or they are not. If the statements are nontestimonial, the confrontation clause is not implicated and admissibility of the statements is subject only to our state's hearsay rules. Crawford, 541 U.S. at 68, 124 S.Ct. 1354. Here, Ta's statements were admitted as excited utterances pursuant to ER 803(a)(2). Such statements are admissible regardless of the availability of the witness. ER 803(a).

On the other hand, if the statements are testimonial, the State must either produce the witness at trial or the defendant must have had a prior opportunity to cross-examine the witness. Crawford, 541 U.S. at 68, 124 S.Ct. 1354. Although, in such instances, the State must also demonstrate that the witness is "unavailable" before the previously confronted testimony may be admitted, Crawford, 541 U.S. at 68, 124 S.Ct. 1354, because it is undisputed that Reed had no prior opportunity to cross-examine Ta, the issue of Ta's availability has no impact on the admissibility of her statements.
[11] Reed asserts that a victim of domestic violence cannot be available as a witness for the defendant. However, in so arguing, he improperly relies on our decision in State v. David, 118 Wash.App. 61, 74 P.3d 686 (2003), rev. on other grounds on recons., 130 Wash.App. 232, 122 P.3d 764 (2005). In David, the victimwho was disabled due to the defendant's abusewas not available to either the defendant or the State, as contact with either party was arranged through the trial court and the victim's legal guardian. 118 Wash.App. at 66-67, 74 P.3d 686. The David decision does not stand for the proposition that a victim of domestic violence is necessarily unavailable to the alleged perpetrator.
[12] Nor did the trial court's instructions create a mandatory presumption. The jury was not required to presume that Reed possessed the specific intent to obstruct Ta's breathing or blood flow by virtue of determining that Reed intentionally assaulted Ta. See State v. Deal, 128 Wash.2d 693, 699, 911 P.2d 996 (1996). Because the trial court's instructions clearly defined the specific intent required to prove strangulation where the defendant was not proved to have actually obstructed the victim's breathing or blood flow, a reasonable juror would have no difficulty discerning that something more than the intent to assault was required to convict. Accordingly, the trial court's instructions did not, as claimed by Reed, create a mandatory presumption that relieved the State of its burden to prove all of the elements of the crime charged. Deal, 128 Wash.2d at 701, 911 P.2d 996.
[13] After defense counsel objected for a third time to the prosecutor's use of this argument, the trial court intervened to issue a lengthy curative instruction. Warren, 165 Wash.2d at 25, 195 P.3d 940. The court instructed the jury that the "reasonable doubt" standard required that a defendant be afforded the benefit of the doubt. Warren, 165 Wash.2d at 25, 195 P.3d 940. The court explained to the jury that "if you still have a doubt after having heard all of the evidence and lack of evidence ... then the benefit of that doubt goes to the defendant, and the defendant is not guilty." Warren, 165 Wash.2d at 25, 195 P.3d 940.
[14] Having considered all the submittals of the parties in our resolution of this case, we deny the State's motion to strike Reed's statement of additional authorities.