

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

CITY OF BOTHELL,

              Respondent,

v.

ERIC SCOTT LEVINE,

              Petitioner.

No. 70241-6-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: January 12, 2015

LEACH, J. — We granted discretionary review of the superior court's order affirming Eric Levine's municipal court conviction for fourth degree assault. The superior and municipal courts rejected Levine's argument, which he reasserts in this court, that admission of the victim's initial statements to police violated his right to confrontation. Because those statements were not testimonial and therefore did not violate the confrontation clause, we affirm.

## FACTS

Based on allegations that Levine choked, assaulted, and threatened his former girlfriend, Giovanna Bustos, the city of Bothell (City) charged him with fourth degree assault.[1]

Before trial, the City informed the municipal court that Bustos had not responded to a subpoena and it would proceed without her. The court then considered the admissibility of Bustos's hearsay statements to Carol Cornelius and the police.

---

[1] Levine's first trial ended in a dismissal without prejudice.

In its offer of proof, the City said Cornelius would testify that a hysterical woman, later identified as Bustos, appeared at her door on August 4, 2008. Bustos was "scared," "crying and panicky," and holding her ear. She told Cornelius that Levine "attacked her in the [truck]" and that she was "smacked in the ear." Bustos had either jumped or been pushed from the truck. Cornelius reported this information to 911. Based on this offer of proof, the court ruled that Bustos's statements to Cornelius came within the excited utterance exception to the hearsay rule. The defense then stipulated that the statements did not violate Levine's right to confrontation.

The court next considered Bustos's two statements to police—a brief initial statement made moments after police arrived and a subsequent, lengthier statement. The parties agreed that Bustos's second statement was testimonial and could not be admitted in her absence. They disagreed about the admissibility of her initial statement.

The City told the court that Bustos made her initial statement within minutes of Cornelius's 911 call. Bothell Police Officer John Lawson would testify that he arrived on the scene within six minutes of a police dispatch report and made "immediate contact" with Bustos. Officer Rogers arrived moments later. Bustos was crying, "very traumatized," and had red marks on her neck. Officer Lawson "had to . . . ask her to sort of slow down and calm down so he could even get a statement from her to determine what had happened, and if any

action needed to be taken." She said "her boyfriend had assaulted her at their residence, that he had hit her, choked her, and threatened to kill her. He drove her away and then threw her out of the vehicle a short distance away." Bustos "believed the threat to kill was real."

Defense counsel argued that some of the proffered evidence was not in Officer Lawson's police report and that Bustos was not, in fact, in an excited state when she talked to him. The City countered that Officer Rogers was also present during Bustos's statements and that his report contained the challenged facts. The court ruled that Bustos's initial statements to Officer Lawson satisfied the excited utterance exception.

The court then considered whether Bustos's initial statements were testimonial and therefore inadmissible under the confrontation clause. The court framed the issue as whether the "circumstances objectively indicate that the primary purpose [of the interrogation] is to enable police assistance to meet an ongoing emergency." The City argued that an ongoing emergency existed because Bustos had a fresh injury, Levine had threatened to kill her, Bustos was "asking the officers for help," and the incident had "occurred . . . within the last 10 minutes." The City noted that Officer Lawson observed scratches on both sides of Bustos's neck. The City also represented that the responding officers received the following information in a police dispatch report:

> Giovanna Bustos saying her boyfriend hit her, saying he was going to kill her, and that he tried to choke her. . . . This occurred at the residence and in the [truck]. She jumped out of the vehicle and ran to listed address, . . . occurred five ago. Neck hurts, put finger in her arm. He has guns, . . . suspect driving, . . . and [she] thinks he probably went back home.[2]

The City argued that the primary purpose of Officer's Lawson's questions to Bustos was "to ascertain the nature of the call, the nature of the emergency, and then to effectuate an arrest." The emergency "was a threat to kill, her being afraid, and Officer Lawson passing on that information to fellow officers to go make an arrest."

Defense counsel disagreed. He maintained any emergency had ended because Levine was no longer at the scene, Bustos was protected by several police officers, and her statements were about past events, not current risks of harm. The court asked whether Officer Lawson had asked Bustos questions or whether she "blurted out" her initial statement. The City responded that it "assumed" Officer Lawson asked questions and offered to bring him in to lay a foundation. The court elected to rule on the existing record, stating,

> The officer was there to try to figure out what the emergency was, what the officers need to do, if there was arrests that needed to be made. So I do believe that the statements that Officer Lawson can testify to, it did also happen approximately six minutes after the alleged assault, and so at this time I will find those to be nontestimonial.

Following additional argument, the court added,

---

2 (Emphasis added.) The defense did not object to the court's consideration of the dispatch report or dispute that the officers received it.

> [T]he critical consideration is not whether the perpetrator is . . . at the scene, but rather whether the perpetrator poses a threat of harm, thereby contributing to an ongoing emergency.
>
> [Bustos] stated: ["]I think he went home.["] But they don't know where he is.
>
> . . . .
>
> . . . . [J]ust because you're surrounded by police officers doesn't mean somebody doesn't act inappropriately.

At trial, Cornelius and Officer Lawson testified consistent with the City's offers of proof.[3] Cornelius testified that Bustos ran up to her door, screaming "Help me, help me," and had blood on her neck and ear. Officer Lawson testified that when he arrived at the scene, he immediately noticed redness and cuts and scratches around Bustos's neck. She was hysterical and had a difficult time catching her breath to speak. Officer Lawson kept medical personnel from entering the area until the scene "was actually clear of any danger." He asked Bustos "if she could tell me what had happened." Bustos then described the entire incident without intervening questions from Officer Lawson. Bustos said Levine had assaulted her and threatened to kill her. She also said that "if she called the police, he would most certainly kill her." Once Officer Lawson determined that Levine was not in the immediate area, he cleared medical personnel to enter the area and examine Bustos for any "injuries that needed immediate medical attention." He then notified other officers that probable cause

---

[3] Although Levine did not renew his motion to exclude Bustos's initial statements to police at trial, both parties rely largely on the testimony at trial. We have considered both the pretrial offers of proof and the testimony at trial.

existed to arrest Levine for domestic violence.   Officer Lawson stayed with Bustos because she was still "very afraid."

Levine testified and denied assaulting Bustos.  He claimed that on the day of his arrest, Bustos left him a phone message accusing him of "following her breath" and "cheating with the girl with the green eyes on the computer."  After taking a shower, Levine emerged to find Bustos inside his residence.  He told her to leave and offered to drive her wherever she wanted to go.  When they entered his truck, she started screaming so loud that he "couldn't even think straight."  He quickly pulled the truck to the side of the road, got out, and turned the alarm on. Bustos left the truck and ran to a nearby home.  Levine then drove his truck to his residence, which was a quarter mile away.  Police arrested him a short time later.

The jury convicted Levine as charged.  He appealed to the superior court, which affirmed.  We granted discretionary review.

## DECISION

The Sixth Amendment's confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."[4]  The confrontation clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."[5]

---

[4] U.S. CONST. amend. VI.
[5] Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

- 6 -

Whether statements made to police are testimonial turns on whether the primary purpose of the interrogation was to determine past facts or to address an emergency or other circumstances.[6] "When . . . the primary purpose of an interrogation is to respond to an 'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the Clause."[7] A court determines the primary purpose of an interrogation by objectively evaluating the circumstances of the encounter and the statements and actions of the parties.[8] It focuses on the purpose reasonable participants would have had, not the subjective or actual purpose of the participants.[9] The State has the burden of establishing that witness statements were nontestimonial.[10] We review alleged violations of the confrontation clause de novo.[11]

Under the primary purpose test, "[w]e first examine the circumstances in which the interrogation occurred."[12] These include "the timing of the statements relative to when the described events occurred."[13] When a victim makes statements within minutes of an assault, they may be considered

---

[6] Michigan v. Bryant, 562 U.S. 344, 131 S. Ct. 1143, 1154-55, 179 L. Ed. 2d 93 (2011).
[7] Bryant, 131 S. Ct. at 1155.
[8] Bryant, 131 S. Ct. at 1156.
[9] Bryant, 131 S. Ct. at 1156.
[10] State v. Koslowski, 166 Wn.2d 409, 417 n.3, 209 P.3d 479 (2009).
[11] Koslowski, 166 Wn.2d at 417.
[12] Bryant, 131 S. Ct. at 1163.
[13] State v. Reed, 168 Wn. App. 553, 563, 278 P.3d 203 (2012) (citing Davis v. Washington, 547 U.S. 813, 827, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)).

contemporaneous with the described events.[14] Here, Officer Lawson arrived on the scene within six minutes of receiving the dispatch and made "immediate contact" with Bustos. While the time between the assault at Levine's residence and Bustos's statements to Officer Lawson is less clear, the assault was essentially ongoing in nature, having begun only a few blocks away at the residence and continued in the truck.[15] And Bustos's hysterical state and fresh injuries objectively manifested a recent assault and/or threat. Viewed objectively, the record supports the inference, drawn by the City below, that Bustos made her first statement within minutes of her being thrown out of or forced to jump from a vehicle in which she had been assaulted.

In addition to the surrounding circumstances, we assess the statements and actions of the parties, including the nature of what was asked and answered during the interrogation.[16] Officer Lawson asked Bustos "what . . . happened." Bustos's answer described both past events and an ongoing threat to her safety. She also showed Officer Lawson the injuries to her neck and expressed her belief that Levine would make good on his threat to kill her. Officer Lawson asked her to "slow down and calm down so he could even get a statement from her to determine what had happened, and if any action needed to be taken."

---

[14] Reed, 168 Wn. App. at 566.
[15] Bustos told Officer Lawson that Levine's residence was only "a few blocks away."
[16] Bryant, 131 S. Ct. at 1160-61; Reed, 168 Wn. App. at 563-64.

(Emphasis added.) An objective view of these facts supports a conclusion that the interrogation was not merely an investigation of past facts but also a response to an ongoing threat.

We also consider the level of formality of the interrogation.[17] "The greater the formality of the encounter, the more likely it is that a statement elicited during that encounter is testimonial. In contrast, disorganized questioning in an exposed, public area that is neither tranquil nor safe" indicates the opposite.[18] The initial questioning in this case "lacked any formality that would have alerted [Bustos] to or focused [her] on the possible future prosecutorial use of [her] statements."[19] Officer Lawson simply asked Bustos what happened, and she recited the essential facts. This type of encounter is more indicative of a response to an emergency than evidence gathering for future prosecution.[20] And while it appears that the questioning occurred on private property, it occurred in the open and close to the spot where Levine was last seen.

Finally, we assess the threat of harm posed by the situation.[21] We do so by considering whether a reasonable listener would conclude that the speaker was facing an ongoing emergency that required help.[22] As noted above, a

---

[17] Reed, 168 Wn. App. at 564; Bryant, 131 S. Ct. at 1160.
[18] Reed, 168 Wn. App. at 564.
[19] Bryant, 131 S. Ct. at 1166.
[20] See Bryant, 131 S. Ct. at 1165-67.
[21] Reed, 168 Wn. App. at 564.
[22] Koslowski, 166 Wn.2d at 419.

scared and injured Bustos ran to Cornelius's home for assistance. Within minutes of either jumping or being forced from Levine's truck, she told Cornelius and Officer Lawson that Levine had assaulted and choked her at his residence, attacked her in the truck, and threatened to kill her if she contacted police. She told Lawson that she believed he would carry out the threat. The dispatch report indicated Levine had guns.[23] Bustos thought Levine had gone to his residence a few blocks away, but his precise whereabouts were unknown. Because he left in a vehicle, he was "highly mobile and could potentially return to the scene."[24] A reasonable listener would conclude from these facts that Bustos was facing a continuing threat.

We reject Levine's contention that any threat had been neutralized because Levine appeared to have left the scene and Bustos was protected by police. Neither the departure of an assailant nor the presence of police automatically neutralizes a threat or ends an emergency.[25] In this case, the offer of proof indicated that while Levine had departed in his truck, he lived only a few

---

[23] We emphasize that the primary purpose test is concerned with the perspectives of all participants, including the declarant. Bryant, 131 S. Ct. at 1160-61. The dispatch report was thus relevant not only to the purpose of Officer Lawson's questions but also to the purpose of Bustos's statements.

[24] Reed, 168 Wn. App. at 568.

[25] Reed, 168 Wn. App. at 567-70; Davis, 547 U.S. at 832 (officers investigating domestic disputes "need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim. . . . Such exigencies may often mean that initial inquiries produce nontestimonial statements." (emphasis omitted) (citation omitted) (internal quotation marks omitted)).

blocks away, was very mobile, and had guns. He had threatened to kill Bustos if she contacted police. She had done just that and was interviewed outside in the open. In these circumstances, Levine still posed a potential threat to both Bustos and the officers. And to the extent the officers' presence provided Bustos some protection, "this protection was contingent upon [the officers'] continued presence at the scene."[26]

We also reject Levine's assertion that Bustos's initial statement was testimonial because she spoke primarily of past facts. As noted above, when statements are made within minutes of the described incident, they may be considered to be statements of contemporaneous, not past, facts. In addition, "it is not inconsistent to speak of past events in conjunction with an ongoing emergency and . . . the fact that some statements are made with regard to recent past events does not cast them in testimonial stone."[27] Thus, while the information provided by Bustos involved past events, those events were contemporaneous with the continuing assault and included an ongoing threat to kill.

Contrary to Levine's assertions, State v. Koslowski[28] does not dictate a different result. In that case, an armed robbery victim gave police a statement minutes after calling 911. In holding that the statement was testimonial and not

[26] Reed, 168 Wn. App. at 570.
[27] Koslowski, 166 Wn.2d at 423 n.8.
[28] 166 Wn.2d 409, 209 P.3d 479 (2009).

part of an ongoing emergency, the Koslowski court emphasized that nothing in the record indicated the robbers might return to the scene or had "any ongoing situation or relationship with [the victim] that might suggest she was still in danger from them."[29] There was no "bona fide physical threat" or any "reason to think that she faced any further threat after the robbers left."[30] In that context, the court found it significant that the victim was also protected by police when she made her statements. Here, by contrast, there was a relationship between the victim and the assailant and an "ongoing situation" and "bona fide threat." Thus, unlike the victim in Koslowski, the victim in this case faced an ongoing threat despite the presence of police.

In conclusion, an objective view of the record indicates that the primary purpose of Officer Lawson's initial questions, and Bustos'sinitial answers, was to address an ongoing threat to Bustos.[31]

---

[29] Koslowski, 166 Wn.2d at 422.

[30] Koslowski, 166 Wn.2d at 423, 425.

[31] See Koslowski, 166 Wn.2d at 428 (citing United States v. Arnold, 486 F.3d 177, 179-80 (6th Cir. 2007) for the proposition that "statements were nontestimonial where the witness [told police at the scene] that the armed defendant had threatened to kill her and he was still in the vicinity"). The Arnold court's reasoning reveals several factual and analytical parallels to this case:

> While it may often be the case that on-the-scene statements in response to officers' questions will be testimonial because the presence of the officers will alleviate the emergency, this is not one of those cases. Neither the brief interval of time after the 911 call nor the arrival of the officers ended the emergency. Arnold remained at large; . . . and for all Gordon (or the officers) knew Arnold remained armed and in the residence immediately in front of them or at least in the nearby vicinity.

Levine's statement of additional grounds fails to adequately inform this court of the nature and occurrence of any alleged errors.[32]

Affirmed.

_Leach, J._

WE CONCUR:

_Spearman, C.J._                    _Appelwick, J._

---

. . . .

. . . [T]he distress that the officers described in her voice, the present tense of the emergency, the officers' efforts to calm her and the targeted questioning of the officers as to the nature of the threat, all . . . suggested that the engagement had not reached the stage of a retrospective inquiry into an emergency gone by. No reasonable officer could arrive at a scene while the victim was still "screaming" and "crying" about a recent threat to her life by an individual who had a gun and who was likely still in the vicinity without perceiving that an emergency still existed.

Arnold, 486 F.3d at 190 (emphasis added).

[32] RAP 10.10(c).