

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

BRYAN EDWARDS CORBETT, JR.,

Appellant.

No. 72453-3- I

DIVISION ONE

UNPUBLISHED

FILED: February 29, 2016

Cox, J. — Bryan Corbett appeals his judgment and sentence based on convictions of burglary, two counts of felony violation of a court order, and fourth degree assault. The jury also found by special verdict that certain of these crimes were aggravated domestic violence offenses. Here, the court properly gave WPIC 4.01 as the reasonable doubt instruction. The court did not abuse its discretion in admitting under ER 404(b) evidence of his acts of prior domestic violence. Corbett fails in his burden to show that the State committed misconduct requiring reversal. The court commented on the evidence in a jury instruction, but the record affirmatively shows that this error did not prejudice Corbett. There was no cumulative error requiring reversal. And finally, the State properly concedes that this record fails to demonstrate the trial court's reasoning in imposing a lifetime sentencing condition prohibiting Corbett from contact with

his son. We affirm the convictions, but strike the sentencing condition imposing the lifetime sentencing condition regarding contact with Corbett's son. We remand with instructions.

The State charged Bryan Corbett with several domestic violence crimes. These charges arose from the same incident on February 2, 2014, Super Bowl Sunday.

C.H. testified at trial that she was with Corbett in her apartment on that day. Corbett and C.H. have a son named J.N. After an argument, she took J.N. and fled to the apartment of her neighbor, Suldan Mohamed. Corbett followed and forced his way into Mohamed's apartment. According to testimony at trial, Corbett picked up a knife block on the kitchen counter and threw it at her. The knife block struck their son, J.N. He lost consciousness.

Mohamed called 911 to obtain medical assistance for J.N. During his call, Mohamed identified the assailant as "Bryan Nichols," based on what C.H. told him. Corbett also goes by the name "Bryan Nichols." Medical personnel and police responded to the scene.

C.H. and J.N. went to the hospital. There, C.H. told a doctor and a social worker from Child Protective Services (CPS) that Corbett was responsible for her and J.N.'s injuries. But to protect Corbett, C.H. initially told the investigating officer that a man named "James Dixon" had assaulted her.

The jury convicted Corbett. The trial court entered its judgment and sentence on the jury verdicts. The sentence included a lifetime ban on Corbett having contact with J.N.

Corbett appeals.

## REASONABLE DOUBT INSTRUCTION

Corbett argues that the reasonable doubt instruction given in this case, WPIC 4.01, is unconstitutional. Because controlling case authority directs the use of this standard instruction, we reject this argument.

As a preliminary matter, the State argues that Corbett cannot raise this issue for the first time on appeal. But an instruction that misstates the reasonable doubt standard is a manifest constitutional error that may be raised for the first time on appeal.[1] Thus, we address his argument to the extent necessary.

Here, the trial court instructed the jury on reasonable doubt, using WPIC 4.01—the standard reasonable doubt instruction. In relevant part, that instruction states "A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence."[2]

Corbett claims this standard instruction is unconstitutional. In substance, he claims the instruction mandates that a juror must be able to articulate a reason in order to have reasonable doubt. He further argues this claimed articulation requirement undermines the presumption of innocence.

The supreme court has ordered trial courts to use WPIC 4.01 in all criminal cases.[3] This court recently noted that directive in rejecting the same

---

[1] See State v. Kalebaugh, 183 Wn.2d 578, 584-85, 355 P.3d 253 (2015).

[2] WPIC 4.01.

[3] State v. Bennett, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007).

3

argument that Corbett makes here.[4] We also reject this argument on the same basis.

## ER 404(B)

Corbett argues that the court abused its discretion in admitting evidence of his prior acts of domestic violence against C.H. We disagree.

In this case, C.H. initially told the police that a man named "James Dixon" had assaulted her. She later testified that "James Dixon" was a name she "made up" to protect Corbett.

Under ER 404(b), the State elicited testimony showing that Corbett had twice assaulted C.H. in 2012. Both times, C.H. had initially lied to "the authorities," stating "that somebody else had committed the crime." But C.H. eventually testified, and Corbett was convicted of both assaults.

Here, the judge instructed the jury that it could consider this evidence only as it related to C.H.'s credibility. This is consistent with the requirements for admission of such evidence.[5]

ER 404(b) limits the admission of prior acts. It states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

---

[4] State v. Lizarraga, No. 71532-1-I, 2015 WL 8112963, at *20 (Wash. Ct. App. Dec. 7, 2015).

[5] State v. Magers, 164 Wn.2d 174, 186-87, 189 P.3d 126 (2008).

The supreme court has held "that prior acts of domestic violence, involving the defendant and the crime victim, are admissible in order to assist the jury in judging the credibility of a recanting victim."[6]

If the trial court properly interprets ER 404(b), we review for abuse of discretion its decision to admit or exclude evidence.[7] "A trial court abuses its discretion if a decision is manifestly unreasonable or based on untenable grounds or untenable reasons."[8] A court also abuses its discretion if it does not follow an evidentiary rule's requirements.[9]

In this case, C.H. recanted her prior statement that "James Dixon" had assaulted her and later identified Corbett as the perpetrator. Thus, the court properly admitted the prior acts of domestic violence, and C.H.'s prior recantations, under ER 404(b).

Corbett acknowledges that C.H. recanted, and thus evidence of the prior acts of domestic violence were admissible. But he argues that there is an additional requirement—"expert testimony explaining the dynamics of domestic violence requirements."[10] This is incorrect.

---

[6] Id. at 186.

[7] State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009).

[8] Skagit County Pub. Hosp. Dist. No. 304 v. Skagit County Pub. Hosp. Dist. No. 1, 177 Wn.2d 718, 730, 305 P.3d 1079 (2013).

[9] Fisher, 165 Wn.2d at 745.

[10] Brief of Appellant at 20.

A majority of the supreme court has declined to adopt this additional requirement.[11] Corbett fails to cite any authority that requires expert testimony before admitting prior incidents of domestic violence under the circumstance of this case. Thus, we reject this argument.

## GOVERNMENT MISCONDUCT

Corbett argues that the State committed "egregious misconduct" by attempting to bribe a material trial witness.[12] We conclude that he has failed in his burden to show that the alleged misconduct requires reversal.

As a preliminary matter, the State argues that Corbett may not raise this issue for the first time on appeal. We disagree.

The supreme court, with little analysis, has stated that outrageous government conduct implicates "due process under the Fifth and Fourteenth Amendments of the federal constitution."[13] Thus, we address this issue.

This doctrine "is founded on the principle that the conduct of law enforcement officers and informants may be 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'"[14] To violate due process, the government's conduct

---

[11] See Magers, 164 Wn.2d at 197-98 (C. Johnson, J. dissenting).

[12] Brief of Appellant at 12.

[13] State v. Lively, 130 Wn.2d 1, 18, 921 P.2d 1035 (1996).

[14] Id. at 19 (quoting United States v. Russell, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)).

"must shock the universal sense of fairness."[15]  Government conduct is outrageous if it "amount[s] to criminal activity or conduct 'repugnant to a sense of justice.'"[16]

Corbett's argument centers on a recorded telephone conversation between Suldan Mohamed and Detective Adam Thorp of the Domestic Violence Unit.  Detective Thorp was investigating the incident in Mohamed's apartment on which the charges in this case were based.  The incident included the assailant throwing an empty knife block at C.H., which hit her son, J.N.

Our review of the record reveals that the State questioned Mohamed, who testified at trial, about this conversation.  During cross-examination, Corbett also questioned him about the conversation:

> [Corbett:] Do you remember feeling pressured by Detective Thorp to participate in the prosecution?
>
> [Mohamed:] Yeah, in a sense.  You can be subpoenaed, you can be—you know, didn't want to incriminate myself.
>
> [Corbett:] Do you remember being told that the name of the person that Detective Thorp wanted you to help prosecute was Bryan Nichols or Bryan Corbett?  Do you remember him telling you that?
>
> [Mohamed:] They tell me, correct, that his first and last name. Because the first and last time that I heard his name was the night—the night that I was in the 911.  And that's why I asked her what's his first and last name.
>
> [Corbett:] And do you remember Detective Thorp offering to buy you a set of steak knives as a thank you if you were to agree to help him prosecute Bryan Corbett?

---

[15] Id.

[16] Id. at 22 (quoting People v. Isaacson, 44 N.Y.2d 511, 378 N.E.2d 78, 83, 406 N.Y.S.2d 714 (1978)).

7

[Objection overruled]

[Mohamed:] Yeah, he said he offered me, that is correct. The officer said, We'll buy you, if in the case that you don't want this, we will buy you a knife set or whatever. I said, I don't want nothing to do with this stuff, it's okay. Not interested.

[Corbett:] So the conversation you had with Detective Thorp started out with you saying you don't know how tall or short the man was, him telling you it was vitally important that you helped him prosecute Bryan Corbett by name, and offered to give you a gift if you would do so; is that correct?

[Mohamed:] Offered to replace.

[Corbett:] He told you you could keep the old one when they were done using it as evidence too, though, right?

[Mohamed:] In a sense, something like that. But what I meant to say was I didn't want him to buy me anything. But he offering. He said, We'll buy you, you know, one if you—

[Corbett:] It was very clear—

[Mohamed:]—if you will allow us to keep it, he allow if—We taking this for evidence, but when we done, we'll buy you, if you want, another one. That was the offer.[17]

Detective Thorp testified later in the trial. During cross-examination, Corbett questioned him regarding a portion of his testimony on direct:

[Corbett:] You stated in response to a question from [the State] that you didn't offer Mr. Mohamed anything to cooperate in the investigation and prosecution of Mr. Corbett?

[Detective Thorp:] That is correct.

[Corbett:] That's actually not true, though, is it?

[Detective Thorp:] That is true, sir.

[Corbett:] You offered to buy him a set of steak knives that would be his to keep, didn't you?

---

[17] Report of Proceedings Vol. 4 (July 16, 2014) at 183-84.

8

[Detective Thorp:] Not in exchange for testimony or a statement.

[Corbett:] You didn't explicitly state that it was in exchange for anything, right?

[Detective Thorp:] That is correct. It was simply a replacement for what he was—he had lost.

[Corbett:] All right. So let's make sure I understand. You told him you really needed his help to prosecute Mr. Corbett, it was very important that he cooperate, right?

[Detective Thorp:] I'm sure at some point I expressed the interest in getting a statement, yes.

[Corbett:] And then you told him, We'd be happy to buy you a set of steak knives, which would be yours to keep at the end of the case, right?

[Detective Thorp:] That is correct, but not in the same conversation.

[Corbett:] I beg your pardon, wasn't it all in the same conversation, within about a minute?

[Detective Thorp:] I don't believe so, but—

[Corbett:] I'm going to play for you a section of that recorded testimony.

[Corbett:] Okay.

[Corbett:] And bear with me. It might take a minute to get the exact spot right.

(Recording transcribed as follows:)

MR. MOHAMED: (Inaudible) Does that make sense?

DETECTIVE THORP: Yeah. And by the way, I need to advise you, this line is recorded. But you are a huge part of this particular case as far as bringing justice to the perpetrator and making sure that he is held responsible as the only witness. Because [C.H.] may not be very cooperative right now, and so it really relies heavily on your— on your—on what you saw on your statements and whatnot. In fact, I've been authorized by the Prosecuting Attorney's Office to

9

buy you a new knife set, knife block and knife set, and you can keep your old ones, as well, if that's something you're interested in.

(End of audio recording.)

[Corbett:] So not merely in the same conversation, but almost literally in the same breath; wouldn't you agree?

[Detective Thorp:] Okay. That sounded pretty close, yes.[18]

At trial, Corbett denied that he was the assailant. Thus, identity was a primary issue. C.H. had given a false name—"James Dixon"—when questioned on the day of the incident. And Mohamed had initially indicated that he was uncertain whether Corbett was the assailant. Thus, Corbett sought to impeach the testimony of both Mohamed and Detective Thorp by the examinations quoted earlier in this opinion. Corbett continued this strategy at closing argument, arguing, in part, as follows:

> [The prosecutor] states that you know [C.H.] is telling the truth now because of what Mr. Mohamed said. I'd like to talk to you about Mr. Mohamed. I'm sure it was an easy argument for [the prosecutor] to make that it's ridiculous that Mr. Mohamed lied because he told them for a set of steak knives. That is ridiculous. No one is saying that that's what happened.
>
> What did happen is that Mr. Mohamed had a very startling event occur to him. Shortly after that, you heard his own voice telling the detective, I don't know, man, it was a black male. I couldn't say how short or tall he was. Looking at a picture of him probably wouldn't help me recognize him. I just don't know.
>
> Then what happened? Detective Thorp called him on the phone, and you heard Detective Thorp's voice on that tape as well. Detective Thorp told Mr. Mohamed that it was critically important that Mr. Mohamed save the day. That Mr. Mohamed be the one to make sure that Bryan got convicted. He didn't ask him anything, he told him, This is the man who did it, you need to make sure that he gets convicted, because no one else can save the day.

_____

[18] Id. at 207-09.

10

He pulled out all the stops. Honestly, have any of you ever heard of a detective offering to buy a set of steak knives? It's absurd, to borrow [the prosecutor]'s phrase.

That's not why Mr. Mohamed told you what he told you. There are more subtle reasons for what he did. How do we know he couldn't properly identify Bryan? Because he told you so in his own voice on the tape. I wouldn't be able to recognize him, I don't know how tall he was, it happened so fast.

Then, under pressure, and being given an opportunity to feel important and to feel as though he had helped and as though he had saved the day, then he spent every day for the last six months walking in and out of his building, multiple times, seeing a picture of the man that he had been told was guilty by the detective. Of course he identified Mr. Corbett. Of course he did.[19]

Based on this testimony and closing argument, Corbett argues that the State attempted to bribe Mohamed by offering to replace the knife block and buy a knife set for him in exchange for favorable testimony at trial. He further claims this constitutes "egregious conduct," requiring reversal. We cannot agree.

First, we are struck by the fact that Corbett's trial counsel made what appears to this court to have been a reasonable tactical decision to elect to put these facts before a jury to impeach two important witnesses on the issue of identity. Counsel elected not to seek any remedy from the trial court, either by a mistrial motion or a request to strike the testimony of Mohamed. Thus, there is no ruling by the trial court for us to review.

Second, Corbett concedes on appeal that Mohamed was a reluctant witness at trial. The record bears this out. He testified at trial that he was there

---

[19] Report of Proceedings Vol. 6 (July 21, 2014) at 412-13.

because the State subpoenaed him and told him he would go to jail if he did not testify. Mohamed also declined the detective's offer.

The jury heard this testimony and was in the best position to judge his credibility. Likewise, the jury was in the best position to judge the credibility of Detective Thorp on whether he was offering to bribe Mohamed or offering to replace property that had been taken as evidence. We do not review credibility determinations.[20]

We would be far more concerned about Mohamed's testimony if the jury had not been apprised of his recorded telephone conversation with Detective Thorp. But we simply cannot find fault with trial counsel's tactical choice to put these facts before the jury in the hope that doing so would successfully impeach Mohamed's testimony on the primary issue of identity.

Third, Corbett relies on cases that are inapposite to support his argument. Corbett uses In re Disciplinary Proceedings Against Bonet[21] to argue that a prosecutor commits professional misconduct by offering a benefit "to a witness with intent to influence that person's testimony."[22] While we agree with that proposition, the record here does not show that the prosecutor attempted to offer a benefit to Mohamed to influence his testimony.

---

[20] State v. Robinson, 189 Wn. App. 877, 896, 359 P.3d 874 (2015).

[21] 144 Wn.2d 502, 29 P.3d 1242 (2001).

[22] Brief of Appellant at 15.

Corbett relies on Detective Thorp's statement to Mohamed that he "[had] been authorized by the Prosecuting Attorney's Office to buy [Mohamed] a new knife set."[23] But the fact that the prosecutor's office authorized buying a new knife set does not by itself show intent to influence Mohamed's testimony. In Bonet, the prosecutor dropped a pending charge against a witness as part of an agreement for that witness not to testify in a trial.[24] Thus, the record in this case does not resemble the record in Bonet.

The other cases on which Corbett relies are also distinguishable from the present case. State v. Cory[25] and State v. Peña Fuentes[26] involve eavesdropping on privileged conversations between clients and defense counsel—"shocking and unpardonable" conduct.[27] Similarly, in State v. Monday, the prosecutor "s[ought] to achieve a conviction by resorting to racist arguments."[28] Comparing these cases to the present case, the alleged misconduct here fails to "shock the universal sense of fairness."[29] Thus, Corbett fails to show that due process requires reversing his convictions.

---

[23] Report of Proceedings Vol. 4 (July 16, 2014) at 209.

[24] Bonet, 144 Wn.2d at 514-15.

[25] 62 Wn.2d 371, 372, 382 P.2d 1019 (1963).

[26] 179 Wn.2d. 808, 811, 318 P.3d 257 (2014).

[27] Cory, 62 Wn.2d at 378.

[28] 171 Wn.2d 667, 680, 257 P.3d 551 (2011).

[29] Lively, 130 Wn.2d at 19.

In sum, we conclude that Corbett fails in his burden to show that the State engaged in "criminal activity or conduct 'repugnant to a sense of justice'" that requires reversal.[30]

## COMMENT ON THE EVIDENCE

Corbett claims that the court gave an improper jury instruction, which constituted a comment on the evidence. We agree that the jury instruction did comment on the evidence. But the record shows that the comment did not prejudice Corbett.

Corbett received an exceptional sentence based on two sentence enhancements. One enhancement was that Corbett's crimes were part of an ongoing pattern of abuse for a prolonged period of time. "[W]hether a particular pattern of abuse occurred over a 'prolonged period of time'" is a question for the jury.[31]

Washington's constitution prohibits judges from commenting on the evidence.[32] In State v. Brush, the supreme court held that WPIC 300.17, a pattern jury instruction defining "'a prolonged period of time'" as "'more than a few weeks,'" was an impermissible comment on the evidence.[33]

---

[30] Id. at 22 (quoting Isaacson, 378 N.E.2d at 83).

[31] State v. Brush, 183 Wn.2d 550, 558, 353 P.3d 213 (2015).

[32] CONST. art. IV, § 16.

[33] 183 Wn.2d 550, 558-59, 353 P.3d 213 (2015).

Here, the trial court provided the jury the same pattern jury instruction defining a prolonged period of time that was the subject of <u>Brush</u>. The State properly concedes that, under <u>Brush</u>, this instruction constitutes an improper comment on the evidence.

A comment on the evidence does not automatically require reversal.[34] Rather, courts apply a two-step analysis to determine whether the error requires reversal: "Judicial comments are presumed to be prejudicial, and the burden is on the State to show that the defendant was not prejudiced, unless the record affirmatively shows that no prejudice could have resulted."[35]

Thus, the question is whether the State can meet its high burden to show that giving this instruction in this case did not prejudice Corbett.

In <u>Brush</u>, the court determined that the State failed to show that the comment on the evidence was not prejudicial.[36] In that case, the State presented evidence showing that the "abuse occurred during a two-month period."[37] Thus, the State could not show that the jury instruction, which stated that a prolonged period of time was more than a few weeks, was not prejudicial.[38]

---

[34] <u>State v. Levy</u>, 156 Wn.2d 709, 725, 132 P.3d 1076 (2006).

[35] <u>Id.</u> at 723.

[36] 183 Wn.2d at 559-60.

[37] <u>Id.</u> at 555.

[38] <u>Id.</u> at 559-60.

In contrast, in <u>State v. Levy</u>, the supreme court held that a comment on the evidence was not prejudicial.[39] In that case, the court instructed the jury that the apartment in question constituted a "building" for the purposes of the burglary statute.[40] Although this was improper, Levy had never challenged that the apartment was a building.[41] Under the facts of that case, the court held "that the jury could not conclude that [the] apartment was anything other than a building."[42]

Here, unlike in <u>Brush</u>, the uncontested evidence showed that the domestic abuse had occurred for a period far longer than a few weeks. The admitted evidence showed that Corbett had been convicted of over 20 domestic violence crimes from 2003 to 2014, the time of trial.

This case is like <u>Levy</u>. In <u>Levy</u>, the defendant did not challenge that the apartment was a building.[43] Similarly, here Corbett did not challenge that the period from 2003 to 2014 was a prolonged period of time. If the jury believed the evidence on the prior domestic abuse, it could not have failed to find that the domestic abuse occurred over a prolonged period of time.

Accordingly, the State has met its burden to show that the comment on the evidence in this case was not prejudicial. There is no reversible error.

---

[39] 156 Wn.2d 709, 726-27, 132 P.3d 1076 (2006).

[40] <u>Id.</u> at 716, 721.

[41] <u>Id.</u> at 726.

[42] <u>Id.</u>

[43] <u>Id.</u>

Corbett argues that this case resembles State v. Becker.[44] We disagree.

In that case, the trial court improperly commented on the evidence by instructing the jury that an education program was a school for the purposes of a school-zone enhancement.[45] The supreme court determined that that this comment on the evidence was prejudicial.[46]

But in Becker, whether the education program was a school was a contested issue. The "Defendants presented considerable evidence at trial that [the education program] d[id] not have many of the attributes of a traditional school otherwise required by law."[47] And the defendants' theory of the case was that the education program was not a school under the statute.[48] Thus, "Although the major issue at trial was whether [the education program] itself was a school within the meaning of the statute RCW 69.50.435, the trial court's special verdict essentially withheld that determination from the jury."[49]

Accordingly, Becker is distinguishable. Here, Corbett did not challenge the length of the alleged abuse. And whether 10 years is a prolonged period of time was not an issue in this case.

---

[44] 132 Wn.2d 54, 935 P.2d 1321 (1997).

[45] Id. at 65.

[46] Id.

[47] Id. at 58.

[48] Id. at 59.

[49] Id. at 63.

## PROSECUTORIAL MISCONDUCT

Corbett next argues that the prosecutor committed misconduct during closing argument. He fails in his burden to show either misconduct or prejudice.

To prevail on a claim of prosecutorial misconduct, the defendant must establish that the prosecutor's conduct was both improper and prejudicial.[50] If a defendant fails to object at trial, we grant relief only if the remark was "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice."[51] "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'"[52] Additionally, when the defendant fails to object, it "'strongly suggests to a court that the argument or event in question did not appear critically prejudicial to an appellant in the context of the trial.'"[53]

"In closing argument, a prosecutor is afforded wide latitude to draw and express reasonable inferences from the evidence."[54] We review alleged prosecutorial misconduct in "the context of the total argument, the issues in the

---

[50] State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012).

[51] Id. at 760-61.

[52] Id. at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

[53] State v. McKenzie, 157 Wn.2d 44, 53 n.2, 134 P.3d 221 (2006) (quoting State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990)).

[54] State v. Reed, 168 Wn. App. 553, 577, 278 P.3d 203 (2012).

case, the evidence [addressed in the argument], and the instructions given to the jury."[55]

Corbett argues that the prosecutor committed misconduct during closing argument for two reasons. Neither argument is persuasive.

### Impugning Defense Counsel

Corbett first argues that the prosecutor impugned defense counsel during closing argument by characterizing the defense's arguments as "absurd."

Prosecutors may argue that "the evidence does not support the [defendant's] theory of the case."[56] But they "must not impugn the role or integrity of defense counsel."[57]

A prosecutor's disparaging remarks about the defense's arguments do not necessarily disparage defense counsel—"isolated remarks calling defense arguments 'bogus' and 'desperate,' while strong and perhaps close to improper, do not directly impugn the role or integrity of counsel, and such isolated comments are unlikely to amount to prosecutorial misconduct."[58]

For example, in State v. Brown, the prosecutor described part of the defense's theory of the case as "'ludicrous.'"[59] The supreme court held that this was not misconduct, stating "[t]he use of the word 'ludicrous' was simply editorial

---

[55] Emery, 174 Wn.2d at 764 n.14.

[56] Thorgerson, 172 Wn.2d at 465.

[57] Id.

[58] Id. at 466.

[59] 132 Wn.2d 529, 565-66, 940 P.2d 546 (1997).

comment by the prosecuting attorney which was a strong, but fair, response to the argument made by the defense."[60]

In contrast, in State v. Thorgerson, "the prosecutor impugned defense counsel's integrity, particularly in referring to his presentation of his case as 'bogus' and involving 'sleight of hand.'"[61] "In particular, 'sleight of hand' implies wrongful deception or even dishonesty in the context of a court proceeding."[62] Similarly, in State v. Lindsay, the prosecutor impugned defense counsel by stating that counsel had "pitched . . . a crock" to the jury.[63] This impugned defense counsel because that term "implies deception and dishonesty" and is "a shortening of an explicitly vulgar phrase."[64]

Likewise, in State v. Warren, the prosecutor impugned defense counsel.[65] In that case, the prosecutor "described defense counsel's argument as a 'classic example of taking these facts and completely twisting them to their own benefit, and hoping that you are not smart enough to figure out what in fact they are

---

[60] Id. at 566.

[61] 172 Wn.2d 438, 451-52, 258 P.3d 43 (2011).

[62] Id. at 452 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2141 (2003)).

[63] 180 Wn.2d 423, 433, 326 P.3d 125 (2014).

[64] Id. at 433-34.

[65] 165 Wn.2d 17, 29-30, 195 P.3d 940 (2008).

doing.'"[66] But even in that case, these comments were "not so flagrant and ill intentioned that no instruction could have cured them."[67]

Here, the prosecutor used a variation of the phrase "quite frankly absurd" three times in closing argument. He used this phrase twice to characterize the argument that C.H. would use the assault on her child as an opportunity to frame Corbett. The third time he used it to characterize the argument that Mohamed identified Corbett as the assailant to receive a free set of knives.

Corbett did not object to any of these characterizations, suggesting that trial counsel did not consider them objectionable in the context of the trial. Instead, Corbett chose to use closing argument to respond to the prosecutor's comments. Corbett acknowledged that the idea that "Mr. Mohamed lied . . . for a set of steak knives" was "ridiculous." Corbett went on to distinguish his argument from the prosecutor's characterization. He also responded to the prosecutor's other uses of the word "absurd."

Here, the prosecutor did not directly impugn defense counsel. Thus, his comments resemble those in <u>Brown</u>, not those in <u>Lindsay</u>, <u>Thorgerson</u>, or <u>Warren</u>. In the context of this case, Corbett fails to show that the prosecutor committed misconduct during closing argument. Moreover, he fails to show that a curative instruction would not have cured the alleged misconduct.

---

[66] <u>Id.</u> at 29.

[67] <u>Id.</u> at 30.

Corbett argues that using the word "absurd" is analogous to using the terms "bogus" or "a crock." But those terms, unlike "absurd," imply falsehood or deception.[68] Rather, using "absurd" is analogous to using "ludicrous," "which was a strong, but fair, response to the argument made by the defense."[69]

### "We Know"

Corbett also argues that the prosecutor committed misconduct by repeatedly using the phrase "we know" during closing argument. We disagree.

In certain circumstances, using the phrase "we know" may constitute misconduct.[70] But a prosecutor does not commit misconduct by using this term only to marshal the evidence in the case.[71]

Here, the prosecutor used the phrase "we know" several times during closing argument. Corbett did not object. Accordingly, trial counsel did not believe that using these words was objectionable in the context of the case. And Corbett failed to request a curative instruction.

A fair review of this record shows that the prosecutor used this phrase only to marshal the evidence. Thus, Corbett cannot show that using "we know" was misconduct in this case.

---

[68] Thorgerson, 172 Wn.2d at 451-52; Lindsay, 180 Wn.2d at 433.

[69] Brown, 132 Wn.2d at 566.

[70] State v. Robinson, 189 Wn. App. 877, 894-95, 359 P.3d 874 (2015).

[71] Id. at 895.

## CUMULATIVE ERROR

Corbett also argues that cumulative error requires reversal. We disagree.

Where several errors standing alone do not warrant reversal, the cumulative error doctrine requires reversal when the combined effects of the errors denied the defendant a fair trial.[72]

Here, for the reasons discussed earlier, the court's comment on the evidence was the only error at trial. And as described earlier, the record shows that this error did not prejudice Corbett.

## NO-CONTACT ORDER

Corbett argues that the court improperly prohibited him from contacting his son for life as a sentencing condition. We accept the State's concession of legal error, strike this condition, and remand for resentencing.

"[The] defendant's fundamental rights limit the sentencing court's ability to impose sentencing conditions."[73] Parents have a fundamental right in the care of their children.[74]

If a sentencing condition interferes with a fundamental right, the condition must be "reasonably necessary to accomplish the essential needs of the State

---

[72] State v. Davis, 175 Wn.2d 287, 345, 290 P.3d 43 (2012).

[73] In re Rainey, 168 Wn.2d 367, 377, 229 P.3d 686 (2010).

[74] Warren, 165 Wn.2d at 34.

and public order."[75] "[T]he interplay of sentencing conditions and fundamental rights is delicate and fact-specific."[76]

A court may not impose a no-contact order between a parent and child without "address[ing] the parameters of the no-contact order under the "'reasonably necessary' standard."[77] If a trial court fails to address the proper standard, this court strikes the no-contact order and remands for resentencing.[78]

Here, the trial court imposed a sentencing condition that prohibited Corbett from contacting his son for the duration of Corbett's lifetime. The State properly concedes that the court failed to address the "reasonably necessary" standard. Thus, we strike this condition and remand for reconsideration and resentencing.

We affirm Corbett's conviction, strike the sentencing condition imposing a no-contact order for his lifetime, and remand for reconsideration and resentencing.

_Cox, J._

WE CONCUR:

_Trickey, J_  _Spearman, C.J._

---

[75] Id. at 32.

[76] Rainey, 168 Wn.2d at 377.

[77] Id. at 381-82.

[78] Id.