# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THE STATE OF WASHINGTON,

Respondent,

v.

HOWARD EUGENE WARD, JR.,

Appellant.

No. 77875-7-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: August 12, 2019

APPELWICK, J. — Ward appeals his conviction for assault in the second degree. He contends that the trial court violated his Sixth Amendment right to confrontation by admitting out-of-court statements by a police officer and an emergency room physician. We affirm Ward's conviction but remand for the trial court to strike the DNA collection fee.

## FACTS

In the early morning hours of December 17, 2016, Doris Smith woke up to the sound of screaming. Smith ran downstairs to the recreation room her 47 year old son Howard Ward Jr. shared with his girlfriend Jarmillya Chambers. Smith testified that she found Chambers sitting on the edge of the makeshift bed with blood on her face and a swollen eye, looking "scared and messed up." When Smith picked up Chambers earlier that evening, her appearance was normal. Although Smith did not witness the incident, she knew that Ward and Chambers were the only other people in the home that night. Smith called 911 to report that Ward hit Chambers in the face and that he was leaving the

house at that moment. When Smith passed the phone to Chambers, she told the 911 operator "I can't talk" and "I think my jaw is broke."

Federal Way Police Officer Michael Henrich testified that Chambers was crying and upset and that her face was bloody, swollen, and puffy. When he asked Chambers what happened, she told him that "Ward had punched her in the face with his fists."

Emergency Medical Technician (EMT) William Hedlund also responded to the scene. Hedlund testified that Chambers's face was bleeding and swollen and her nose was displaced to the right. He believed Chambers's injuries appeared consistent with the report that she had been punched in the face.

Due to the extent of her injuries, EMTs transported Chambers to the emergency room (ER) via ambulance over her objection. There, Chambers told Dr. Andrea Drenguis that "her boyfriend had hit her." Dr. Drenguis testified that Chambers had significant bruising, a subconjunctival hemorrhage in her eye, and a displaced nasal bone fracture. Dr. Drenguis testified that the fracture was "brand new" and that the injuries were consistent with blows to the face.

Two days later, police were called after Ward showed up at his sister's house. After Lieutenant Michael Wedel arrested Ward and advised him of his Miranda[1] rights, Ward stated that he recently found out she was cheating on him and that she was mad because he said he would no longer marry her. Ward denied assaulting Chambers and asserted that she was injured on the streets.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The State charged Ward with assault in the second degree – domestic violence.[2] Chambers could not be located for trial, and the State elected to proceed without her. Smith, Hedlund, EMT Sandra Tate, Officer Henrich, Officer Chuck Hinckle, Lieutenant Wedel, and Dr. Drenguis testified at trial for the State. The jury also heard a recording of the 911 call and a recording of Ward's jail calls to his mother. Ward elected not to testify at trial. He presented no witnesses.

The jury found Ward guilty of second degree assault as charged. The trial court sentenced Ward to 78 months of confinement. Ward appeals.

ANALYSIS

I. Right to Confront Witnesses

Ward contends that the admission of Chambers's out-of-court statements indicating that Ward hit her violated his right to confront witnesses against him. Specifically, he contends the statements were testimonial hearsay and were therefore inadmissible. We review an alleged violation of the Confrontation Clause de novo. State v. Manion, 173 Wn. App. 610, 616, 295 P.3d 270 (2013).

The Sixth Amendment confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "[T]he 'principal evil' at which the clause was directed was the civil-law system's use of ex parte examinations and ex parte affidavits as substitutes for live witnesses in criminal cases." State v. Lui, 153 Wn. App. 304, 314,

---

[2] RCW 9A.36.021(1)(a) provides that "[a] person is guilty of assault in the second degree if he or she" . . . [i]ntentionally assaults another and thereby recklessly inflicts substantial bodily harm."

3

221 P.3d 948 (2009) (quoting Crawford v. Washington, 541 U.S. 36, 50, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)), aff'd, 179 Wn.2d 457, 315 P.3d 493 (2009).

The confrontation clause applies to those who "'bear testimony'" against the accused. Crawford, 541 U.S. at 51 (quoting N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)). Admission of a testimonial statement violates a defendant's right of confrontation unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness regarding the statement. Id. at 68. However, if a statement is nontestimonial, it is not subject to the confrontation clause. State v. Wilcoxon, 185 Wn.2d 324, 332, 373 P.3d 224 (2016). The State has the burden of establishing that a statement is nontestimonial. State v. O'Cain, 169 Wn. App. 228, 235, 279 P.3d 926 (2012).

"[A] statement cannot fall within the [c]onfrontation [c]lause unless its primary purpose was testimonial." Ohio v. Clark, ___ U.S. ____, 135 S. Ct. 2173, 2180, 192 L. Ed. 2d 306 (2015). Under the primary purpose test, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Michigan v. Bryant, 562 U.S. 344, 360, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). This inquiry is "highly context-dependent." Bryant, 562 U.S. at 363.

In the police interrogation context,

[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the

primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). This can include threats to the victim, police, or the public at large. See Bryant, 562 U.S. 363. But, "whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." Id. at 366. An additional factor is "'the informality of the situation and interrogation.'" Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 377). "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to creat[e] an out-of-court substitute for trial testimony.'" Id. (alteration in original) (quoting Bryant, 562 U.S. at 358).

## Statement to Emergency Room Physician

Ward contends that Dr. Drenguis's testimony that Chambers said her "boyfriend had hit her" was testimonial. Statements made to medical personnel are nontestimonial where (1) they are made for diagnosis and treatment purposes, (2) there is no indication the witness expected the statements to be used at trial, and (3) the doctor is not employed by or working with the State. State v. Hurtado, 173 Wn. App. 592, 600, 294 P.3d 838 (2013). The primary purpose test also applies in deciding whether such statements are testimonial.[3] State v. Scanlan, 2 Wn. App.2d 715, 725, 413 P.3d 82 (2018), review granted, 191 Wn.2d 1026 (2018).

---

[3] Scanlan noted that, in dicta, the United States Supreme Court "has characterized statements made to medical providers for purposes of diagnosis treatment as nontestimonial." 2 Wn. App.2d at 725 n.1.

Here, Dr. Drenguis stated the following on direct examination:

Q. Now, going back to the -- the patient at hand, Ms. Chambers, do you remember what you treated her for?

A. She came in with the complaint -- excuse me, we call them complaints when people come in for -- for treatment. It's no reflection on what brought them in. But she -- she came in with presentation that she had been assaulted and punched multiple times in the head.

Q. And did you attend to her yourself?

A. I did.

Q. Did she note to anyone in the hospital where she received these injuries?

A. She did not specify where to me.

Q. Did she tell you how or who may have given her these injuries?

A. Yes, she told me that her boyfriend had hit her.

Q. Did she tell you his name?

A. She did not.

. . . .

Q. And what were your observations of her?

A. She appeared to be in pain and she had a significant amount of bruising around her left eye and left upper face, and then some -- some tenderness along her left jaw.

Q. And what concerns, if you had any at that time, for her?

A. We always worry about broken bones. We worry about potential deep cuts that might need sutures, we worry about bleeding, either in the brain or in certain enclosed spaces, like behind the eyes, that can cause significant injury and visual damage.

. . . .

A. I would be worried that her nose was broken. I would also, again, be worried that some of her other facial bones would be broken and that she might possibly have an injury to her eye.

Q. And what about -- what are we seeing there in those photos that makes you think that -- that made you think that that night?

A. Her face is very swollen and has a lot of bruising on the left-hand side. Her nose is also deviated slightly to the right.

Q. And did those injuries appear fresh?

A. Yes.

Q. And when you treated her that night, what steps did you take to treat her, so to speak?

A. So she was initially evaluated and given a very thorough physical exam, which includes cleaning dried blood from lacerations and other places to see if deeper lacerations, again, that may need suturing are present. It involves touching very carefully over the injured areas to see if there's any palpable broken bones that we can assess just on physical exam. She, in particular, also received a -- what we call a fluorescein exam, where I took a dye and stained the actual part of her eyeball to see if she had any direct injuries to the eyeball itself, and then she received a number of imaging studies to see if there were any broken bones there.

. . . .

Q. And so what treatment did you order at that point, after the finding of the broken nose?

A. She received pain medication in the emergency department. She was discharged home with pain medication and an antibiotic.

Q. And did you refer her to any specialists of any kind?

A. She was referred both to an ear, nose, and throat specialist for the broken nose and to an eye specialist to make sure that the bleeding under the eyeball resolved.

Ward contends that Chambers's statement was testimonial because it was not necessary for treatment, discharge, or follow-up. We disagree. Chambers arrived at the emergency room with significant facial injuries. Dr. Drenguis testified that she asks people why they are in the emergency room because "[i]t helps establish what might be the cause of whatever brought them to the ER" and "helps with the clinical diagnosis." Chambers responded to that question by stating that her boyfriend hit her.

7

It is readily apparent that the primary purpose of this exchange was to obtain medical treatment, not to create an out-of-court substitute for trial testimony or to establish or prove past events potentially relevant to later criminal prosecution. Dr. Drenguis asked how Chambers was injured and then used this information to inform her diagnosis and treatment. She did not ask Chambers to specify who caused her injuries, and Chambers did not name Ward as the perpetrator. See Scanlan, 2 Wn. App. 2d at 728-31 (statements made by severely injured elderly man to medical providers at emergency room were made for the primary purpose of treatment).

Ward, citing Hurtado, further asserts that the statement was testimonial because a person in Chambers's position would expect her statements to be used at trial. He contends that Chambers, who had considerable contact with the justice system, did not want to go to the hospital and likely knew that any statements she made would be collected by law enforcement. Hurtado is readily distinguishable. In Hurtado, police were present in the hospital room when the victim told medical personnel that her boyfriend hit her. 173 Wn. App. at 596. This court held that "a reasonable person would believe that [the victim's] statements made in the presence of a police officer would be used as evidence in a future prosecution," particularly where the officer was actively investigating and collecting evidence. Hurtado, 173 Wn. App. at 604-05. In contrast, here, no police officer was present when Chambers spoke to Dr. Drenguis. We also note that Dr. Drenguis worked for a private hospital, not for the State.

In sum, Dr. Drenguis's testimony regarding what Chambers told her was made for the primary purpose of diagnosis and treatment in a private, informal setting that did not

reasonably create a belief that the statements would be used at trial. They were not testimonial and did not implicate the confrontation clause.

### Statement to Police Officer

Ward contends that Officer Henrich's testimony that Chambers said "Ward had punched her in the face with his fists" was testimonial. Here, outside the presence of the jury, Officer Henrich stated the following during direct examination by defense counsel:

> MS. JAMESON: And when you -- when she spoke to you, was it in response to questions from you?
>
> THE WITNESS: Yes, it was.
>
> MS. JAMESON: And did you ask those questions to get a statement from her about what happened?
>
> THE WITNESS: Yes.
>
> MS. JAMESON: And is your purpose for getting such a statement so that you can memorialize it in your report and later refer to it in court if needed?
>
> THE WITNESS Yes.

Defense counsel asserted that Chambers's statements to Officer Henrich were inadmissible under the confrontation clause. The court then allowed the State to examine Officer Henrich as follows:

> MS. BURNS: When you first met with Ms. Chambers, did you know if Mr. Ward had yet been captured?
>
> THE WITNESS I knew he had not been.
>
> MS. BURNS: And was part of your wanting to know what happened during that time -- let me rephrase it.
>
> Is part of your asking Ms. Chambers questions there at the very beginning in anticipation to see what happened at the time to assist other officers?
>
> THE WITNESS: Yes, it is.

MS. BURNS: Now, going back to when you first arrived, let's walk through your first arrival. You walk in, you said she was on the stairs?

THE WITNESS: Yes.

MS. BURNS: And she was crying?

THE WITNESS: Yes.

MS. BURNS Is that when she first made the statement to you?

THE WITNESS: I -- I had to ask her what happened in order to get a statement out of her.

MS. BURNS: And when you're asking what happened, is it for other purposes other than for your report?

THE WITNESS: It's also to ascertain what we have probable cause to arrest for, as officers are looking for him, so we know what we are able to do and not do.

. . . .

MS. BURNS: And did you later take a full statement from her, after she had calmed down?

THE WITNESS: That is correct.

. . . .

MS. BURNS: What are the other reasons that you would be asking questions of a witness right when you arrive?

THE WITNESS Both in order to assist the fire department, who is arriving, so they know what kind of injuries she may have sustained and what kind of treatment they will need for her, as well as what we have probable cause to arrest for. How she sustained those injuries changes what law violation it is.

MS. BURNS: And does that change how officers respond when searching?

THE WITNESS: Yes.

MS. BURNS: And -- and when you say it changes their response, what are you wanting to be able to relay to officers out there?

10

THE WITNESS: What we have probable cause to arrest for. Part of it, as we used in this case, is whether a K-9 [(police dog)] will track on the -- on the incident. They won't track on all what we call simple assault, assault fours, [and] misdemeanor assaults. With severe injuries they will, as was in this case. If a weapon was used, then we'll automatically bump it up to an assault one, two. Any of the felony assaults a K-9 will automatically track on.

MS. BURNS: So is it important for officer safety concerns when deciding whether or not a K-9 is used?

THE WITNESS: Yes, and also the safety. If he was known to be armed with a weapon, which in this case he was not, but that also changes officers' response.

MS. BURNS: And is that why you asked her what she had been struck with?

THE WITNESS: Yes.

. . . .

MS. BURNS: Now, you mentioned about [asking the questions] so the ambulance and fire could treat her injuries. Why would you want to ask her what happened as opposed -- for that purpose?

THE WITNESS: It has to do with the severity of the injuries. If, say, worst case the injuries were from a baseball bat or something like that, there's more risk of crush injuries or traumatic brain damage, things like that, that can't be ascertained simply by looking at somebody. You have to get them into a hospital. But having that information for the fire department can help them adjust their response to her needs.

The court ruled that this testimony did not violate the confrontation clause because the exchange occurred in the context of an ongoing emergency.

Under the primary purpose test, "[w]e first examine the circumstances in which the interrogation occurred." Bryant, 562 U.S. at 371. These include "the timing of the statements relative to when the described events occurred." State v. Reed, 168 Wn. App. 553, 563, 278 P.3d 203 (2012) (citing Davis, 547 U.S. at 827). Here, Chambers made the statement to Officer Henrich very shortly after the assault occurred. Courts consider

11

statements made within minutes of an event to be "contemporaneous[]." State v. Ohlson, 162 Wn.2d 1, 17, 168 P.3d 1273 (2007). Chambers's demeanor and fresh injuries indicated a recent assault and potentially ongoing threat.

We also assess the statements and actions of the parties, including the nature of what was asked and answered during the interrogation. Bryant, 562 U.S. at 367; Reed, 168 Wn. App. at 563-64. "[I]nitial inquiries at the scene of a crime might yield nontestimonial statements when officers need to determine with whom they are dealing in order to assess the situation and the threat to the safety of the victim and themselves." State v. Koslowski, 166 Wn.2d 409, 425-26, 209 P.3d 479 (2009). Here, the nature of the exchange indicates that the purpose of the questions were not only an investigation of past facts, but also a response to an ongoing threat. Establishing that Ward was the correct suspect, and that he hit Chambers in the face with his fists and not with a weapon, provided police with important information regarding the dangerousness of the situation, Chambers's medical condition, and the appropriate response necessary by both police and fire departments.

We also consider the level of formality of the interrogation. Reed, 168 Wn. App. at 564; Bryant, 562 U.S. at 366. "The greater the formality of the encounter, the more likely it is that a statement elicited during that encounter is testimonial." Reed, 168 Wn. App. at 564. Here, the exchange took place in an informal setting, while Chambers was still upset, injured and crying and Ward was still at large. In contrast, Officer Henrich took a full statement from her later when she had calmed down.

Finally, we assess the threat of harm posed by the situation by considering whether a reasonable listener would conclude that the speaker was facing an ongoing emergency

that required help. Koslowski, 166 Wn.2d at 419. As noted above, Chambers was frightened and severely injured. And, there was a high likelihood that Ward would return to Smith's home, particularly given that Chambers and the police knew that Ward was on electronic home detention pending charges stemming from a previous domestic violence incident. To the extent the presence of the police offered Chambers some immediate protection, "this protection was contingent upon [the officers'] continued presence at the scene." Reed, 168 Wn. App. at 570.

We acknowledge that one reason Officer Henrich asked Chambers what happened was to place it in his report for later reference. However, viewed objectively in light of all the circumstances, we conclude that the primary purpose of Officer Henrich's question, and Chambers's answer, was to address an ongoing emergency in an informal setting. Thus, the statement was not testimonial and its admission did not violate the confrontation clause.

We also agree with the State that any error in admitting Chambers's out-of-court statements was harmless. Violations of the confrontation clause are subject to harmless error analysis. State v. Davis, 154 Wn.2d 291, 304, 111 P.3d 844 (2005), aff'd by Davis v. Washington, 546 U.S. 975, 126 S. Ct. 547, 163 L. Ed. 2d 458 (2006). A constitutional error is harmless if we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error. See State v. Jasper, 174 Wn.2d 96, 117, 271 P.3d 876 (2012) (citing Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). We consider the "untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt." State v. Moses, 129 Wn. App. 718, 732, 119 P.3d 906 (2005). Factors bearing on this inquiry include "the importance

of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986). The State bears the burden of proving beyond a reasonable doubt that the error was harmless. Jasper, 174 Wn.2d at 117.

Here, we conclude the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. Smith's testimony and the 911 call indicated that Ward hit Chambers and that she suffered significant injuries as a result. Officer Henrich, Dr. Drenguis, and Hedlund described Chambers's injuries, demeanor, and the scene at the house. Furthermore, Lieutenant Wedel's testimony and Ward's jail calls to his mother provided evidence that Ward was angry at Chambers because he believed she was cheating on him, thus establishing motive. Any error in admitting Chambers's out-of-court statements was harmless beyond a reasonable doubt.

II. Impeachment Evidence

Prior to trial, Ward moved to admit evidence of Chambers's previous crimes of dishonesty as relevant to her credibility under ER 609(a) and ER 404(a)(2), regardless of whether or not she appeared to testify. ER 609(a) permits a party to attack the credibility of a witness with evidence of a prior conviction "if elicited from the witness or established by public record during examination of the witness." The State conceded that the evidence was admissible for impeachment under ER 609(a), but only if Chambers testified at trial. Defense counsel conceded that "I couldn't find any legal basis that I could

use to persuade this court to allow it in unless she testifies." The court denied Ward's motion.

Ward, citing State v. Mohamed, 186 Wn.2d 235, 375 P.3d 1068 (2016), now asserts that a new trial is required because Chambers's criminal history was admissible even though she did not testify. In Mohamed, the State moved to have the defendant's prior convictions admitted for impeachment purposes pursuant to ER 609(a)(2) in the event he testified at trial. 186 Wn.2d at 238. The defendant did not testify, but his out-of-court statements were admitted into evidence through his expert witness's testimony. Id. at 238-39. The court granted the State's motion to impeach the defendant with his prior convictions pursuant to ER 806.[4] Id. The Washington Supreme Court held that the defendant's out-of-court statements opened the door to impeachment under ER 806, which permits impeachment of a declarant when a hearsay statement is admitted into evidence. Id. at 241-42.

Ward is correct that Chambers's criminal history would have been admissible under ER 806. However, we agree with the State that Ward waived review of this claim of error by failing to raise it below. "A party may assign evidentiary error on appeal only on a specific ground made at trial." State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). Appellate courts generally will not consider issues raised for the first time on appeal unless it is a manifest claim affecting a constitutional right. RAP 2.5(a); Kirkman, 159 Wn.2d at 926.

---

[4] Under ER 806, "[w]hen a hearsay statement . . . has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness."

15

Here, Ward argues for the first time on appeal that Chambers's criminal history was admissible for impeachment purposes under ER 806. He did not cite ER 806 in his written motion or during oral argument. His motion cited only ER 609(a) and ER 404(2) as possible grounds for admission. Moreover, Ward affirmatively informed the trial court that no authority existed to admit such evidence unless Chambers were to testify. Accordingly, we decline to consider it.

III.   DNA (deoxyriboneucleic acid) Collection Fee

Ward appeals the DNA collection fee imposed as part of his sentence. Ward contends, and the State concedes, that the $100 DNA collection fee should be stricken due to his indigence, previous DNA collection, statutory amendments, and State v. Ramirez, 191 Wn.2d 732, 746-50, 426 P.3d 714 (2018). We accept the State's concession and remand for the trial court to strike the DNA collection fee from the judgment and sentence.

Affirmed and remanded.

WE CONCUR: